**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DIESEL EBOOKS, LLC,<br><br>                 Plaintiff,<br><br>    - against -<br><br>APPLE, INC.; HACHETTE BOOK GROUP, INC.; HARPERCOLLINS PUBLISHERS, L.L.C.; VERLAGSGRUPPE GEORG VON HOLTZBRINCK GMBH; HOLTZBRINCK PUBLISHERS, LLC D/B/A MACMILLAN; THE PENGUIN GROUP, A DIVISION OF PEARSON PLC.; AND SIMON & SCHUSTER, INC.,<br>                 Defendants. | Case No. 1:14-CV-1768 (DLC) |

**AMENDED ANSWER, AFFIRMATIVE DEFENSES,
AND COUNTERCLAIMS OF DEFENDANT HOLTZBRINCK
PUBLISHERS, LLC D/B/A MACMILLAN TO THE SECOND AMENDED COMPLAINT**

Defendant and Counterclaim-Plaintiff Holtzbrinck Publishers, LLC d/b/a Macmillan ("Macmillan"), by and through its undersigned counsel, states as follows:

## ANSWER TO THE SECOND AMENDED COMPLAINT

Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, Macmillan hereby incorporates its answer and affirmative defenses filed on February 9, 2015 (14-cv-1768 Docket Entry 96) to Diesel's Second Amended Complaint (14-cv-1768 Docket Entry 86) (the "Second Amended Complaint").

## AMENDED COUNTERCLAIMS

Pursuant to Federal Rules of Civil Procedure 7, 8, 13, and 15, Macmillan, for its amended counterclaims against Counterclaim-Defendant Diesel, alleges as follows:

1. Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, Macmillan hereby incorporates its original Counterclaim against Diesel filed on July 21, 2014 (the "First Counterclaim").

### Preliminary Statement

2. Beginning in or about October 2012, Counterclaim-Defendant Diesel and its founder and Chief Executive Officer, L. Scott Redford ("Redford"), devised and implemented a scheme, code-named "Project Mayhem" by Redford, to defraud Macmillan and other Publisher Defendants (collectively, the "Publishers") by intentionally circumventing the territorial restrictions in the Publishers' e-book distribution agreements, which limited the sale of e-book titles to customers in the United States, or to customers in the United States and Canada. In breach of these agreements and in violation of the copyrights for the Publishers' e-book titles, Diesel intentionally sold and distributed thousands of e-books to international customers outside the United States and Canada before Diesel ceased doing business in or about 2014. Diesel and its technology vendor intentionally programmed the Diesel e-bookstore and digital fulfillment system to make unlicensed copies of the Publishers' e-books accessible for purchasing and

downloading by international customers, including through the use of gift certificates marketed for the purpose of bypassing restrictions in the Diesel e-bookstore check-out process that were required under the Publishers' distribution agreements to screen and block access to and purchases of the Publishers' e-books outside the United States and Canada.

3. Pursuant to the Project Mayhem scheme, Diesel intentionally concealed its unauthorized international e-book transactions by, among other things, entering fake U.S. country codes to complete the digital fulfillment process for downloading copies of the Publishers' e-books to international customers, and using fake U.S. state codes for the international transactions in sales tax reports submitted to the Publishers and to Diesel's digital fulfillment provider. Diesel and Redford instructed Diesel's employees and technology vendors to maintain the secrecy of "Project Mayhem," including by limiting written communications concerning the scheme, to prevent the Publishers and Diesel's digital service provider from detecting the unauthorized international e-book transactions. Upon information and belief, Diesel used inflated sales revenues from its unauthorized international distribution of the Publishers' e-books to bolster its failing retail e-book business in an ultimately unsuccessful effort to attract potential candidates for investing in or purchasing the Diesel business.

4. Macmillan has filed these additional counterclaims for breach of contract, copyright infringement, and fraud arising out of Diesel's willful misconduct as alleged below. Macmillan seeks to recover damages for the harm caused by Diesel, potentially including either actual damages or statutory damages of up to $150,000.00 for each separate copyrighted Macmillan e-book that was willfully infringed by Diesel, and Macmillan's costs and attorneys' fees pursuant to 17 U.S.C. § 505.

**Background**

5.      Macmillan distributes copyrighted books in both physical and digital form under the terms of publication agreements with authors who hold the copyrights to their books. The authors, who continue to hold the copyright, grant Macmillan or its U.S. affiliates the exclusive right to publish and distribute the copyrighted works. Macmillan distributes its own and its affiliates' e-books (collectively, "Macmillan e-books") globally through agreements with its distributors.

**A.    Macmillan's Agency Agreement With Diesel Prohibited e-Book Distribution in Territories Outside the United States and Canada**

6.      By contract dated as of March 25, 2011, Macmillan entered into an agency e-Book Distribution Agreement with Diesel-eBooks.com, LLC (formerly Tools of the Shade, Inc. DBA Diesel eBooks) ("Diesel"). That Agency Agreement granted Diesel limited rights in Macmillan e-books for the duration and subject to the provisions of the agreement.

7.      Subsequently, on August 20, 2012, Macmillan entered into a second agency agreement (the "Agency Agreement"), "supersed[ing] and replac[ing]" the agreement of March 25, 2011, designating Diesel as the nonexclusive agent for sales of Macmillan e-books to customers in the United States of America and Canada only.

8.      Specifically, pursuant to Section 1(a) of the Agency Agreement, Macmillan appointed Diesel as its nonexclusive agent for the distribution and delivery of Macmillan e-books "for the Territory specified in Section 1(d) herein." Section 1(d) of the Agency Agreement defined the "Territory" as "the United States and Canada":

> The Territory with respect to each Publisher E-Book will be the United States and Canada except that if the Publisher by notice, or in metadata Publisher provides to Agent pursuant to this Agreement, does not authorize the distribution of any particular E-Books in either the United States or Canada, the 'Territory' with

4

>respect to those Publisher E-Books will exclude such country. Publisher may change the Territory with respect to any Publisher E-Book(s) to add either the United States or Canada at any time by notice or in metadata. For clarity, notwithstanding that Publisher may designate territories other than the United States and Canada in the metadata, *the Territory shall not include any such other territories*.

(Agency Agreement § 1(d) (emphasis added).)

9. During the relevant time period covered by these Counterclaims, Macmillan did not authorize Diesel to distribute Macmillan e-books in any territories outside the United States and Canada.

10. Pursuant to Section 1(d) of the Agency Agreement, Diesel agreed that it would cause the websites for its e-bookstore to "screen and block purchases and access outside the Territory by using the purchaser's credit card bill-to address, any address specified by the would-be purchaser upon registration with the Websites, and any other geographic information [Diesel] may obtain concerning the would-be purchaser."

11. Section 1(e) of the Agency Agreement provided that all rights in Macmillan's e-books "not specifically granted in this Agreement are reserved by the Publisher." Diesel agreed that it would "not use or authorize the use of" Macmillan e-books, "or any copies made from them, and will not distribute or make [Macmillan] E-Books available other than as expressly authorized in this Section 1 or elsewhere in this Agreement." (Agency Agreement § 1(e).) Diesel further agreed that it would "not make use of or authorize the use of all or any portion of the contents of any works published or scheduled to be published by" Macmillan, "except as expressly authorized in this Agreement without permission from the applicable rightsholder." (*Id.*)

12. Pursuant to the Agency Agreement, Diesel offered Macmillan e-books for sale through its online e-bookstore. Diesel required shoppers to register before shopping at its e-bookstore and to log in upon each visit to the store. The registration process required customers to create a username and password and to provide other customer information, including address and country location. Upon information and belief, Diesel collected information identifying would-be purchasers of e-books outside the United States and Canada through, among other things, the customer's credit card bill-to address associated with purchases of e-books and gift cards from Diesel's e-bookstore, the customer's address used to register with and log in to the Diesel e-bookstore, and geographic IP data from the customer's computer or device when accessing the Diesel e-bookstore.

**B. Redford Conceives of Project Mayhem and Directs Others to Maintain the Secrecy of the Scheme**

13. Upon information and belief, beginning in October 2012, Redford and Diesel began collaborating with Diesel's technology vendor, Neal Kaiser of Upshot Commerce, to market, sell, and distribute Macmillan e-books and those of the other Publishers to international customers, in willful violation of the Publishers' distribution agreements and the copyright licenses for the Publishers' e-books, in order to inflate Diesel's sales and defraud the Publishers. Diesel code-named this scheme "Project Mayhem."

14. Upon information and belief, when Redford conceived of Project Mayhem in October 2012, he took steps to conceal his plans from the Publishers and from Diesel's digital fulfillment provider, Ingram DV LLC ("Ingram"). On October 8, 2012, Redford sent an email to Neal Kaiser of Upshot Commerce, Diesel's technical advisor, with the subject "I'm going to call you. I have an idea," and the text, "but I don't want to email you about it." (Exhibit A hereto at UPSHOT0003815.) In a follow-up email to Kaiser shortly thereafter, Redford wrote that "I'm

assuming you know the 3 rules of project mayhem," and Kaiser replied, "Tyler told me, yes." (Exhibit B hereto at UPSHOT0003834.)

15. Upon information and belief, "Project Mayhem" and "Tyler" are references to a movie based on the novel *Fight Club*, in which the first "rule" of the Fight Club formed by the main character and his alter ego, named Tyler Durden, is as follows: "You don't talk about fight club." The movie also features a "Project Mayhem," and the first rule of Project Mayhem is: "You don't ask questions about Project Mayhem." (Exhibit C hereto at 83:21-84:25.)

16.  (*See* Ex. C at 83:24-84:7

17. According to the "rules" of Diesel's Project Mayhem, Redford instructed Kaiser and other employees to limit written communications about the scheme and to discuss details about Project Mayhem only in person or by phone, in order to avoid detection. (Ex. C at 83:24-84:7; *see also* Exhibit D hereto at UPSHOT0002726 (January 20, 2013 email from Redford to Kaiser, subject line "Project Mayhem 2.0" and text stating: "I think I just had a eureka moment. Per Mayhem guidelines, all action items will be communicated via the phone."); Exhibit E hereto at UPSHOT0003517 (November 2, 2012 email from Redford to Kaiser asking whether Kaiser's programming team, known as the "mod squad," knew "the rules of fight club.").)

18. Nevertheless, Redford, Kaiser, and others involved in the scheme exchanged multiple emails about Project Mayhem over the next several months.

**C. Operation of Project Mayhem**

19. Pursuant to Project Mayhem, Diesel displayed and provided access to copies of Macmillan e-books and those of the other Publishers for purchase and download at the Diesel online bookstore, but intentionally did not screen and block customers outside of the United States and Canada. [redacted]

20. [redacted] (Ex. C at 55:6-7), [redacted] (*Id.* at 52:15-19.)

21. [redacted] (Ex. C at 54:13-19 [redacted]

22. To further implement Project Mayhem, Diesel entered fake U.S. country codes during the digital fulfillment process, rather than the international customer's actual

country of origin, so that customers outside of the U.S. and Canada could access copies of the Publishers' restricted e-books for downloading and viewing, either indirectly from Ingram's servers in the U.S. (as Diesel's digital fulfillment provider for certain Publishers), or from Diesel's own servers in the U.S. (for Publishers with whom Diesel had direct agency relationships, such as Macmillan). (*See, e.g.*, Exhibit F hereto at DEB_00050098 (October 10, 2012 email from Kaiser to Redford, reporting that Upshot's programming team "want[ed] to bill 20-25 hours to do the coding changes for the 'fake' country stuff. Working with them to try and simplify this.").)

23. To further conceal the unauthorized international e-book sales, Diesel similarly used fake U.S. state tax codes to substitute for the actual international locations of the Project Mayhem sales in monthly sales tax reports that Diesel submitted to Ingram and the Publishers. On October 16, 2012, Redford instructed Kaiser to conceal the existence of the international e-book sales by using "Massachusetts" as the fake tax state for all Project Mayhem sales in Diesel's monthly tax reports. Kaiser explained the Project Mayhem tax issue in an email to Redford:

> We have an issue. Even if we send US to LSI [a/k/a Ingram] and make the download fulfil, the tax would still be calculated based on the user's actual location by the taxing code in divinity (ZERO). And hence no tax would be levied as the user is outside the US. Then how should we send the tax report to LSI? If diesel plans to not levy tax from the user but still pay a tax to the LSI, which state should we use for this in tax report?
>
> So basically, you are losing out on the tax, but I guess you already know that. And second, what state should we use for tax reporting? I guess one that isn't taxed, right? Any recommendations[?]

(Exhibit G hereto at UPSHOT0003735.) In response, Redford instructed Kaiser to "Use massachusetts" [sic] as the fake state tax code in Diesel's sales tax reports. (*Id.*)

24. As the volume of Project Mayhem sales began to increase, however, Redford became concerned that the number of fake "Massachusetts" transactions on Diesel's tax reports might alert the Publishers or Ingram to the Project Mayhem scheme. On November 1, 2012, for example, Redford advised Kaiser that it "[l]ooks weird with all those sales to MA" appearing on a draft sales report to Random House and instructed Kaiser to "rotate [Massachusetts] with some other locales" as fake state tax codes in future sales reports. (Exhibit H hereto at UPSHOT0003495 (November 1, 2012 email between Redford and Kaiser).)

25. In response to Redford's email, Kaiser instructed his programmers to use the fake Massachusetts tax code in Diesel's sales reports only for international transactions that violated the Publishers' territory restrictions: "And to clarify, it's not ALL international of course. Only those that are breaking the territory requirements. e.g., if they are buying a book w/o restrictions, then no changes to what we report." (Ex. H at UPSHOT0003495.)

26. On November 2, 2012, Redford instructed Kaiser to ensure that fake state tax codes would be used for Project Mayhem transactions in "all manual reports: Ingram, Macmillan and Random House." (Ex. E at UPSHOT0003517.) But Redford cautioned Kaiser that using Massachusetts for every Project Mayhem transaction looked too suspicious: "It looks suspect that 240 of the 454 transactions for the RH report (and 407 of 840 for Ingram) are from the same person in Agawam MA." (*Id.*) Redford therefore instructed Kaiser to randomize the use of fake state tax codes for the Mayhem transactions in Diesel's monthly tax reports to avoid possible detection of the scheme: "I've got an idea. For each of the mayhem transactions why don't we randomly pull info from a transaction back a month or two before." (*Id.*)

27. Similarly, on November 5, 2012, Redford pressed Kaiser in an email to revise an overdue sales tax report to Macmillan because nearly half of the reported sales

represented unauthorized international transactions that had been coded using a fake address to the same fictitious purchaser in Agawam, Massachusetts pursuant to Project Mayhem. Of the draft Macmillan sales report, Redford wrote: "come on, man, we're late. look at macmillan. More than half is from one buyer." (Exhibit I hereto at DEB_00042198.)

28. Upon information and belief, and based on the draft October 2012 Macmillan sales report that Macmillan believes is referenced in the November 5, 2012 email identified in the preceding paragraph, Diesel falsely attributed 108 of the 227 Macmillan e-books sold by Diesel in October 2012 to a purchaser in Agawam, Massachusetts. Upon information and belief, Macmillan believes that Diesel sold at least those 108 Macmillan e-books to customers outside the United States and Canada pursuant to Project Mayhem, in violation of the territory restrictions in Macmillan's Agency Agreement.

29. Upon information and belief, after November 5, 2012, Diesel began randomly selecting fake state codes to disguise international sales under Project Mayhem in its monthly sales tax reports submitted to Macmillan, making it more difficult for Macmillan to detect the unauthorized international sales.

**D.   Project Mayhem Inflated Diesel's Sales Revenue**

30. Project Mayhem increased sales for Diesel, which had been struggling financially. On October 25, 2012, Redford sent Kaiser an email containing a chart entitled "Mayhem Sales," and wrote, "Look very closely at this. Can you guess what happened just before the uptick on the 19th? Mayhem." (Exhibit J hereto at DEB_00019795.)

31. ███████████████████████████████████
███████████████████████████████████
█████████████ (Ex. C at 59:10-14█████████████████████
███████████████████████████████████

11

██████████████████  ████████████████████████); *see also* Exhibit K hereto at UPSHOT0003003 (January 8, 2013 email from Redford to Kaiser, in which Redford writes, "Mayhem is key. gotta have it.")

32. The increased revenue from Project Mayhem further increased the importance of hiding the scheme from Macmillan and the other Publishers. On January 8, 2013, Redford received an email from Ingram asking for an explanation for apparent international sales of e-books published by John Wiley & Sons that were restricted to the United States: "When I reviewed Kelli's spreadsheet of missing sales tax remittance by Diesel, I noticed a number of Wiley Agency sales occurred outside the US (see attached). Looking at your catalogs, I only see these titles available as Agency . . . . Can you help me understand how the international sales occurred?" (Exhibit L hereto at UPSHOT0003016.) Redford wrote an email to Kaiser expressing his concern about discovery of Project Mayhem: "this cannot happen. cannot happen. raises a red flag on us and invites inspection, see attached and her note. puts entire project mayhem in jeopardy." (*Id.*)

E. **Redford Shuts Down Project Mayhem to Avoid Detection by the Publishers**

33. Pursuant to its settlement in *United States v. Apple, Inc., et al.*, No. 1:12-CV-2826, in February 2013, Macmillan authorized Diesel to engage in certain discounting subject to additional reporting requirements. (Exhibit M hereto at DEB_00115438-DEB_000115439 (February 21, 2013 email from Amy Wolosoff to Scott Redford).)

34. On February 4, 2013, Redford discussed with Kaiser how to make Diesel's new weekly reports work in light of the unauthorized international sales. He wrote, "One obvious issue is that the zip codes are showing International usage. Remember this has to sync with other agency reports ala Project mayhem." (Exhibit N hereto at UPSHOT0002392

12

(February 4, 2013 email from Redford to Kaiser forwarding January 4, 2013 Ingram email discussing reporting standards).)

35.     Upon information and belief, in 2013, Diesel continued to affirmatively solicit e-book sales to customers outside the United States and Canada pursuant to Project Mayhem by sending email promotions to all of its international customers advertising gift certificates that could be used to circumvent territory restrictions and purchase restricted e-books.  In March 2013, however, an issue with the modifications made to Diesel's software under Project Mayhem caused Diesel's website to reject attempts by customers outside the United States and Canada to purchase Diesel e-books using gift certificates advertised in one email promotion, resulting in a number of error tickets.  Redford wrote to Kaiser to express his concern that the website failed to override the territory restrictions for the unauthorized transactions:  "I'm furious. Furious. I send a huge fucking international mailing and which obviously is contingent on the territory shit [w]orking I can't even fucking type[] I"m [*sic*] so mad. this was the chance to get them [referring to customers outside the U.S. and Canada] back and you blew it.  fix this now now now."  (Exhibit O hereto at UPSHOT0001939.)  Redford further advised Kaiser that the email promotion had been designed to generate unauthorized sales under Project Mayhem, but failed to do so given the processing errors:  "I spend a couple of bucks on what should be a sure thing considering project mayhem and then this. it kil[l]s me." *Id.*

36.     Upon information and belief, on May 23, 2013, Diesel sent another email promotion offering gift certificate coupons to its international customers for use in circumventing the Publishers' territory restrictions, bearing the subject line:  "We understand – international territory rules frustrate."   (Exhibit P hereto at UPSHOT0001451.004 (May 28, 2013 email from Redford to Kaiser).)  The email advertised a "No More Territory Frustration – 30% coupon," and

stated as follows: "The eBook industry hasn't always been kind to our global friends. While these restrictions are beyond our control, we've been working hard to address these gaps. . . . To get started use the 30% coupon below. It's good through May." (*Id.* at UPSHOT0001451.007.) Upon information and belief, Diesel promoted the 30% discount as an incentive for customers outside the United States and Canada to purchase the gift certificates for use in buying e-Books and in circumventing the Publishers' territory restrictions.

37. Later in May 2013, Lisa Pannek of Penguin asked Ingram about Diesel's apparent Australian sales of certain Penguin USA titles to which Hachette had the Australian rights. After an email exchange discussing the possibility that the Publishers might test Diesel by attempting to buy unauthorized titles in Australia, Redford directed Kaiser to "shut down mayhem right now please." (Ex. P at UPSHOT0001451.002; *see also* Exhibit Q hereto at UPSHOT0001453 (May 28, 2013, email from Redford to Kaiser: "Read her message. Got to reject it. They will probe.").)

38. Thereafter, Diesel confronted numerous logistical issues with customers who had purchased books unlawfully, but could no longer access those books from their online "bookshelves" maintained on the Diesel website because Project Mayhem had been shut down. (*See, e.g.*, Exhibit R hereto at DEB_00016010, DEB_00015893, and DEB_00015822.)

39. The loss of the unauthorized international sales had a negative effect on Diesel's business. In July 2013, Redford reported to Kaiser that "Sales are horrible now that mayhem is gone." (Exhibit S hereto at UPSHOT0001214 (July 12, 2013 email Redford to Kaiser).)

**Jurisdiction and Venue**

40. This Court has jurisdiction over these Counterclaims under 28 U.S.C. § 1367, because the Counterclaims forms part of the same case or controversy under Article III of the United States Constitution as Diesel's claims within the Court's original jurisdiction. Further, this Court has jurisdiction over the copyright counterclaim under 28 U.S.C. § 1338. These Counterclaims are compulsory under Fed. R. Civ. P. 13(a) because they arise from the same case or controversy as the claims brought by the Plaintiff.

41. This Court also has personal jurisdiction over Diesel, and venue is proper in this Court, pursuant to Section 9(g) of the Agreement, wherein "the parties hereby consent to the jurisdiction of [the Southern District of New York] in any action involving any [dispute arising out of or relating to the Contract]" and the parties each agree "not to contest the venue of any action involving any such dispute in . . . the Southern District of New York," and because Diesel has waived venue and personal jurisdiction objections to these Counterclaims by bringing suit in this Court.

**Second Counterclaim for Relief**
**(Breach of Contract)**

42. Macmillan realleges and incorporates the allegations contained in Paragraphs 1-41 as if fully set forth herein.

43. Diesel entered into a valid e-book agency retailer agreement with Macmillan. The contract is governed by and construed in accordance with the laws of the State of New York.

44. Macmillan fully performed all of its obligations under its Agency Agreement with Diesel.

45. As alleged above, Macmillan has uncovered documents indicating that in 2012-2013, Diesel and Redford orchestrated a scheme to defraud Macmillan and other publishers by intentionally circumventing territorial restrictions in breach of the Agency Agreement with Macmillan and its agreements with other Publishers, and in violation of their copyrights. Diesel breached the Agency Agreement by, among other actions, marketing, selling, and distributing Macmillan e-books to international customers outside the United States and Canada, by failing to screen and block international customers outside the United States and Canada from obtaining access to and purchasing Macmillan e-books on Diesel's online e-bookstore, and by submitting sales tax reports that falsely reported unauthorized international e-book sales as sales from customers in random U.S. states.

46. Diesel engaged in the unauthorized sale and distribution of Macmillan e-books to international customers outside the United States and Canada without the knowledge of, or permission from, Macmillan, and in fact Diesel took measures to ensure that its scheme would not be uncovered by Macmillan.

47. As a result, Macmillan was unable to protect against Diesel's illegal copying and distribution of Macmillan e-books.

48. Diesel's actions have resulted in financial loss to Macmillan.

**Third Counterclaim for Relief**
**(Copyright Infringement)**

49. Macmillan realleges and incorporates the allegations contained in Paragraphs 1-48 as if fully set forth herein.

50. Macmillan and its U.S. affiliates routinely register the copyrights in their books in the name of the author before the first publication of the work or within three months after the first publication.

51. As alleged above, Diesel willfully infringed the copyrights in Macmillan's and its U.S. affiliates' books by, among other actions, marketing, selling, reproducing, and distributing copies of their e-books from computer servers located in the United States to international customers outside the United States and Canada in violation of the territorial restrictions in Macmillan's Agency Agreement; displaying and providing access to their e-books for such international customers from computer servers located in the United States, in violation of the requirements in Macmillan's Agency Agreements to screen and block access to such customers; processing credit card payments through computer servers located in the United States for the purchase of gift certificates marketed to, and used by, such international customers for the purpose of bypassing territorial restrictions in the check-out process on Diesel's digital bookstore when purchasing such e-books; reproducing digital copies of their e-books and making those copies available, on computer servers located in the United States, for purchasing, downloading, and use by such international customers; and displaying and maintaining copies of e-books purchased by such international customers, on digital "e-bookshelves" in Diesel's e-bookstore on computer servers located in the United States, for additional downloading and use by such customers, in violation of the territory restrictions in Macmillan's Agency Agreement.

52. The multiple infringing acts as alleged herein constitute "predicate acts" of infringement committed by Diesel in the United States that permitted further acts of infringement by Diesel's international customers outside the United States and Canada, and thus are fully actionable under United States copyright law. Diesel engaged in the multiple infringing acts alleged herein, and violated the territorial restrictions in Macmillan's Agency Agreement, with respect to at least the ▓▓▓▓▓▓▓▓ listed on Exhibit T attached hereto. The copyright in each of the ▓▓▓▓ listed on Exhibit T was registered before the first publication of the book

or within three months after the first publication. Macmillan is the legal and/or beneficial owner of exclusive e-book world distribution rights in each of the books listed on Exhibit T. Upon information and belief, Diesel infringed the copyrights of multiple additional Macmillan e-books that have been concealed pursuant to "Project Mayhem."

53. The infringing acts by Diesel were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

54. Macmillan is entitled to either its actual damages or statutory damages of up to $150,000.00 from Diesel for each separate copyrighted Macmillan work that was willfully infringed by Diesel, in addition to Macmillan's costs and attorneys' fees pursuant to 17 U.S.C. § 505.

**Fourth Counterclaim for Relief**
**(Fraud)**

55. Macmillan realleges and incorporates the allegations contained in Paragraphs 1-54 as if fully set forth herein.

56. Pursuant to the fraudulent "Project Mayhem" scheme alleged herein, Diesel knowingly sold Macmillan e-books to international customers outside the United States and Canada, even though Diesel knew, at the time, that it was not entitled to sell e-books to such customers pursuant to the territorial restrictions in Macmillan's Agency Agreement.

57. In addition to its breach of Macmillan's Agency Agreement, Diesel engaged in multiple, independent acts of fraud and misrepresentation designed to conceal the "Project Mayhem" scheme and prevent Macmillan from detecting the unauthorized international e-book sales and terminating Diesel's contract, including by using fake U.S. country codes to process unauthorized international sales during the digital e-book fulfillment process, and by

using fake U.S. state tax codes for international purchases in monthly sales reports submitted to Macmillan.

58. Diesel engaged in these fraudulent acts and falsely represented that that it had complied with its contractual obligations to Macmillan, with the intent that Macmillan would rely on such misrepresentations. Diesel affirmatively misled Macmillan in order to conceal and continue to engage in its wrongful "Project Mayhem" scheme.

59. Macmillan relied to its detriment on Diesel's false representations and continued to do business with Diesel, thereby increasing its losses and exposure to injury.

60. Diesel is liable for the damages incurred by Macmillan caused by Diesel's intentional and willful fraud, including punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Macmillan prays that the Court issue an order (a) entering judgment with respect to Macmillan's Answer dismissing Diesel's Second Amended Complaint with prejudice, and (b) entering judgment with respect to Macmillan's Counterclaims (i) awarding to Macmillan its costs, including reasonable attorney's fees on Macmillan's copyright Counterclaim pursuant to 17 U.S.C. § 505; (ii) awarding damages against Diesel on Macmillan's Counterclaims Nos. 1-4, in amounts to be determined at trial, including actual damages or statutory damages of up to $150,000.00 for each separately infringed copyrighted e-book pursuant to 17 U.S.C. § 504(c) on Macmillan's copyright Counterclaim and punitive damages on Macmillan's fraud Counterclaim; and (iii) granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
June /?, 2015

                                    SIDLEY AUSTIN LLP

                                    By: _____
                                       Joel M. Mitnick
                                       John J. Lavelle
                                       Dorothy Du
                                       jmitnick@sidley.com
                                       jlavelle@sidley.com
                                       ddu@sidley.com
                                       787 Seventh Avenue
                                       New York, New York 10019
                                       Telephone: (212) 839-5300

                                       *Counsel for Defendants Holtzbrinck Publishers,*
                                       *LLC d/b/a Macmillan and Verlagsgruppe Georg*
                                       *Von Holtzbrinck GmbH.*