UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **DIESEL EBOOKS, LLC**<br><br>                    **Plaintiff,**<br><br>    v.<br><br>**HACHETTE BOOK GROUP, INC.; HARPERCOLLINS PUBLISHERS L.L.C.; VERLAGSGRUPPE GEORG VON HOLTZBRINCK GMBH; HOLTZBRINCK PUBLISHERS, LLC d/b/a MACMILLAN; THE PENGUIN GROUP, A DIVISION OF PEARSON PLC.; and SIMON & SCHUSTER, INC.**<br><br>                    **Defendants.** | 14 Civ. 1768 (DLC)<br><br>**FILED UNDER SEAL CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO A PROTECTIVE ORDER** |

**REPLY BRIEF IN SUPPORT OF PUBLISHER DEFENDANTS'
JOINT MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT...................................................................................................................................2

    I.    Diesel Cannot Establish That It Suffered an Antitrust Injury..................................2

        A.    Diesel's Business Model Was Not Based on Discounting, Bundling, or Rewards Points .......................................................................2

        B.    Any Harm Caused By the Product Outage Was Not Material and Does Not Constitute Antitrust Injury.............................................................6

    II.    Diesel Presents No Evidence that Shows the Alleged Antitrust Violation Was a Material Cause of Diesel's Failure................................................................8

CONCLUSION................................................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
  626 F.3d 699 (2d Cir. 2010) ................................................................................................... 5

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  No. 09 Civ. 2227(PAC), 2015 WL 4991868 (S.D.N.Y. Aug. 20, 2015) .................................. 3

*Argus, Inc. v. Eastman Kodak Co.*,
  801 F.2d 38 (2d Cir. 1986) ............................................................................................. 1, 3, 8

*Blue Shield of Virginia v. McCready*,
  457 U.S. 465 (1982) ................................................................................................................ 7

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ............................................................................................................ 6, 7

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................................ 3

*Discover Fin. Servs. v. Visa U.S.A. Inc.*,
  582 F. Supp. 2d 501 (S.D.N.Y. 2008) .................................................................................. 10

*DNAML Pty, Ltd. v. Apple Inc.*,
  25 F. Supp. 3d 422 (S.D.N.Y. 2014) ................................................................................... 2-3

*Drug Mart Pharmacy Corp. v. American Home Products Corp.*,
  472 F. Supp. 2d 385 (E.D.N.Y. 2007) .................................................................................. 10

*In re Flonase Antitrust Litig.*,
  798 F. Supp. 2d 619 (E.D. Pa. 2011) .................................................................................... 10

*Greater Rockford Energy & Tech Corp. v. Shell Oil Co.*,
  998 F.2d 391 (7th Cir. 1993) ............................................................................................ 9-10

*Magnetar Techs. Corp. v. Intamin, Ltd.*,
  801 F.3d 1150 (9th Cir. 2015) .............................................................................................. 10

*Matsushita Electric Industrial Co. v. Zenith Corp.*,
  475 U.S. 574 (1986) ................................................................................................................ 3

*In re Nexium Antitrust Litig.*,
  42 F. Supp. 3d 231 (D. Mass. 2014) ...................................................................................... 7

*Perkins v. Standard Oil Co. of Cal.*,
    395 U.S. 642 (1969) ................................................................................................................. 3

*Pinky Originals, Inc. v. Bank of India*,
    No. 94 CIV. 3568 (AGS), 1996 WL 603969 (S.D.N.Y. Oct. 21, 1996) ................................... 5

*In re Publication Paper Antitrust Litig.*,
    690 F.3d 51 (2d Cir. 2012) ....................................................................................................... 3

*United Mag. Co. v. Murdoch Mag. Distribution, Inc.*,
    393 F. Supp. 2d 199 (S.D.N.Y. 2005) ..................................................................................... 10

*U.S. Football League v. Nat'l Football League*,
    842 F.2d 1335 (2d Cir. 1988) ................................................................................................. 10

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969) ............................................................................................................... 10

**PRELIMINARY STATEMENT**

Following extensive discovery, the undisputed, contemporaneous evidence—consisting almost entirely of Diesel's[1] own documents—has revealed that Diesel's business model did not hinge on aggressive price competition. Instead, the record reveals that Diesel did not rely on discounting, bundling, or rewards points before or after the adoption of agency and that restrictions on these promotional tools were not a material cause of Diesel's failure. In fact, prior to agency, Diesel suffered under Amazon and Barnes & Noble's significant competitive advantages, including their ability to rely on enormous resources to consistently beat Diesel's prices. Thus, Diesel welcomed the change to agency pricing. Indeed, Diesel wanted a level playing field, as evidenced by the fact that, even when it could, Diesel did not discount or bundle after agency. But, Diesel never could overcome its shortcomings, and even admitted to an illicit scheme to intentionally breach its distribution contracts and violate U.S. copyright law in a misguided effort to stay afloat.

In its Opposition, Diesel remarkably fails to present a shred of contemporaneous evidence to counter the Publisher Defendants' arguments that Diesel cannot establish antitrust injury or causation. Instead, Diesel relies on self-serving, after-the-fact testimony from its CEO and its experts' unreliable, conclusory statements. This evidence—which is nothing more than a series of *ipse dixit* statements without any empirical study in support—cannot be credited.[2] The Second Circuit has held that post-hoc self-serving testimony cannot raise a disputed issue of material fact when faced with substantial contemporaneous contradictory evidence. *See, e.g.*, *Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 42-46 (2d Cir. 1986).

For this reason, Diesel cannot raise a genuine issue of material fact that would entitle it to a trial. Its purported antitrust injury is unsupported by any reliable evidence. All of the contemporaneous evidence shows that, despite Diesel's belated attempt to transform the nature

---

[1] Capitalized terms not defined herein shall have the same meaning they had in the Memorandum of Law in Support of Publisher Defendants' Joint Motion for Summary Judgment ("Motion for Summary Judgment" or "Mot.").

[2] The invalidity of Diesel's expert's conclusions is further discussed in Defendants' Motion to Exclude the Expert Opinion of James D. Ratliff.

of its actual business model to fit the needs of its new litigation strategy, Diesel's business strategy did not hinge on aggressive price competition. While Diesel cites to the drop in revenue immediately after the agency model was implemented, this drop had nothing whatsoever to do with agency pricing. Certain wholesalers were not logistically and technologically ready for the agency model, and Diesel failed to secure direct relationships, resulting in a temporary delay of certain e-books. This "product outage" was entirely unrelated to agency pricing.

Even if Diesel could establish that it suffered an antitrust injury (which it did not), the Publisher Defendants are still entitled to summary judgment because the evidence shows that neither the inability to discount, bundle, or offer rewards nor the product outage were a material cause of Diesel's failure. Indeed, the contemporaneous evidence shows that eighteen independent issues contributed to Diesel's failure. Diesel never accounts for these alternative causes. Its reliance on its CEO's self-serving, unsupported testimony and its experts' unreliable conclusions to establish causation is insufficient to raise a genuine issue of material fact, and summary judgment should be granted.

## ARGUMENT

### I. Diesel Cannot Establish That It Suffered an Antitrust Injury

#### A. *Diesel's Business Model Was Not Based on Discounting, Bundling, or Rewards Points*

Diesel repeatedly cites to the Court's decision on the Motion to Dismiss DNAML's complaint as if the Court already determined that Diesel suffered an antitrust injury. *See, e.g.*, Memorandum in Support of Diesel EBooks, LLC's Opposition to Publisher Defendants' Motion for Summary Judgment, 14 Civ. 1768 (DLC), filed October 16, 2015 ("Opposition" or "Opp.") at 8 ("This Court denied the motion to dismiss, holding that retailers 'who wished to compete on price suffered an antitrust injury' flowing from the price-fixing conspiracy because they were 'forced to stop discounting [] prices for e-books and offering discount-driven promotions' . . . ."). But, the Court's ruling on the Motion to Dismiss was based on Plaintiffs' allegations that their business models "hinged on aggressive price competition." *See DNAML Pty, Ltd. v. Apple Inc.*,

25 F. Supp. 3d 422, 427, 429 (S.D.N.Y. 2014).  At this stage of the case, Diesel's allegations no longer have to be accepted as true; instead, Diesel must make a sufficient showing based on the evidence that its business model was, in fact, predicated on aggressive price competition and discount-driven promotions.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also* Mot. at 12 (citing cases).[3]

Diesel has simply failed to present any credible evidence to establish that its business model was based on aggressive price competition or even discount-driven promotions.  Indeed, in an attempt to raise an issue of fact, Diesel relies entirely on self-serving deposition testimony and a declaration from its CEO, Scott Redford.  None of this after-the-fact testimony, however, is corroborated by any business plans,[4] emails, public statements, communications with investors, or other documents.

Instead, Diesel's claims of aggressive price competition and use of price promotions is contradicted by the contemporaneous evidence.  The empirical data shows that both Amazon and Barnes & Noble had, on average, much lower prices than Diesel across all e-books.  56.1 Stmt. ¶ 8.  Moreover, in 2009, Diesel reported a gross profit margin of 27.4%, while Amazon reported a gross profit margin of ▌▌▌▌▌▌, which further evidences Diesel's higher prices.  56.1 Stmt. ¶ 8.  Faced with this data, Diesel had to change the nature of its claim.[5]  Now, Diesel admits that it

---

[3] Diesel incorrectly asserts that summary judgment is not appropriate here because causation is fact-intensive.  Opp. at 9.  Numerous cases have granted summary judgment where the non-moving party failed to provide sufficient proof of causation.  *See Matsushita Electric Industrial Co. v. Zenith Corp.*, 475 U.S. 574, 586-87 (1986); *Argus*, 801 F.2d at 42-45; *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09 Civ. 2227(PAC), 2015 WL 4991868, at *24-25 (S.D.N.Y. Aug. 20, 2015).  None of the cases Diesel cites, including those from before *Celotex* and *Matsushita*, suggest that a plaintiff is not required to meet this burden of proof.  *See, e.g., Perkins v. Standard Oil Co. of Cal.*, 395 U.S. 642, 648-49 (1969) (requiring "sufficient evidence in the record to support an inference of causation"); *In re Publication Paper Antitrust Litig.*, 690 F.3d 51, 61, 67-8 (2d Cir. 2012) ("[S]ummary judgment serves a vital function in the area of antitrust law.'").

[4] Diesel cites to one business plan related to its social eReader (Redford Decl. Ex. 5), which Diesel claims would have solved its technological deficiencies and its lack of a proprietary e-reader.  Opp. at 7, 21.  But the document reveals that even under Diesel's optimistic projections, the social eReader would not have been completed until the end of 2011, leaving it far behind the other retailers and the roll out of tablets.  Redford Decl. Ex. 5.  Moreover, despite Redford's self-serving testimony, there is nothing to support the claim that social eReader would "change the landscape of the market, catapult Diesel's business forward, and enhance its value considerably."  Opp. at 7.  Such after-the-fact hyperbole underscores the contrast of what was happening in the real world and the fictional world created for this case.

[5] Notably, Diesel's expert failed to conduct any analysis as to Diesel's discounting practices.

3

could not compete with major retailers on the front list titles but claims that it beat the major retailers on the backlist. Opp. 3, 11-12. But, other than self-serving, after-the-fact testimony of its CEO, Diesel has provided no evidence to support this claim. In fact, Diesel admits that it only "pursued strategies of setting retail prices as a marketing tool" and that its strategy did not involve "matching Amazon's low prices."[6] 56.1 Resp. ¶ 8.[7] Diesel cannot choose not to compete with the major e-book retailer in the industry and still claim that its business model "hinged on aggressive price competition." It is economic nonsense.

Moreover, Diesel's own documents contain glaring admissions that it was excited about the switch to agency precisely because it could not effectively compete as an e-books retailer. On the day agency was adopted, Diesel publicly stated that it "simply does not have the capital to keep up with our mega competitors" and welcomed the switch to agency because "the playing field would definitely be leveled so that we can compete against stores with a lot more resource$ [sic]." 56.1 Stmt. ¶¶ 13, 50. Diesel claims that these statements were merely "positive spin" (Opp. at 24), but this explanation is preposterous because it is based on the premise that Diesel's CEO made false, public representations about agency. If there was any truth to the statement that "Redford worried intensely," that worry would have appeared in documents *somewhere*; if Redford was really complaining that Diesel could no longer discount, bundle, or offer rewards, one would expect to find those complaints in Diesel's documents. Diesel cites no document containing contemporaneous worries or complaints about agency pricing. Left with nothing, Diesel relies on a comment from an S&S corporate representative that Redford was a "pain in the ass." Opp. at 24. But this testimony had nothing to do with discounting or Diesel's inability to discount, bundle, or offer rewards after agency—it referred instead to the unprofessional way that Redford contacted the Publishers' authors to complain about a product outage. Collins

---

[6] This statement shows that Diesel, like its co-plaintiff DNAML, seeks to abandon the allegations of its own Complaint likely because discovery has shown that its theory of recovery is not viable. *See* Defendants' Joint Memorandum of Law in Opposition to Plaintiff DNAML's Motion to Exclude the Expert Opinions of Dennis W. Carlton for further discussion regarding DNAML's shifting theories in this case.

[7] Attached as Exhibit A hereto is a chart that sets forth each paragraph in the Publisher Defendants' 56.1 statement, Diesel's response thereto, and the Publisher Defendants' reply to the new facts set forth in Diesel's response.

Decl., Ex. 2 (Stambaugh Dep.) 137:19-138:23. Redford's willingness to brazenly lodge complaints with Publishers' authors actually belies Diesel's explanation that it did not say anything about agency "to avoid upsetting the Publisher Defendants." Opp. at 24.

Additionally, Diesel revealed its actual business model by choosing not to discount or bundle after agency. Indeed, Diesel did not compete with major retailers on non-agency titles and still complained that Amazon and Barnes & Noble's "focus on capturing market share at any cost" inhibited Diesel's revenues. 56.1 Stmt. ¶ 15. Diesel also did not bundle when it could after certain Publishers entered into Consent Decrees.[8] *Id.* at ¶ 16. Diesel's failure to execute its supposed business strategy, even when it could, contradicts Diesel's litigation construct.

The contemporaneous record undeniably shows that Diesel's business model did not hinge on aggressive price competition, bundling, or rewards. In light of that record, Diesel cannot rely on self-serving testimony to raise a material issue of fact as to antitrust injury and avoid summary judgment.[9] *See* Mot. at § II.C; *see also AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 735-36 (2d Cir. 2010) (evidence created after summary judgment was filed could not raise an issue of fact where it was contradicted by documents created at the same time as the transaction at issue); *Pinky Originals, Inc. v. Bank of India*, No. 94 CIV. 3568 (AGS), 1996 WL 603969, at *9 (S.D.N.Y. Oct. 21, 1996) (granting summary judgment because plaintiff's deposition testimony was not "significantly probative in light of the record as a whole" where "there is no contemporaneous evidence" to corroborate that testimony).[10]

---

[8] Diesel claims that it did not discount after the Consent Decrees because it was "too hard" to allocate the discounts with the reporting requirements. Opp. at 12-13. This explanation speaks for itself; Diesel would have figured out how to report those bundles if it truly was "the foundation of Diesel's business model." Opp. at 13.

[9] Diesel's reliance on Ratliff's determination that the switch to agency "disproportionately disadvantaged small retailers," Diesel's Response to Publisher Defendants' Local Rule 56.1 Statement of Material Fact As to Which There Is No Genuine Issue ("56.1 Resp.") ¶ 49, is irrelevant to whether Diesel can establish antitrust injury because it assumes, as much of Ratliff's report does, that Diesel's business model was based on aggressive discounting and bundling. Diesel offered no evidence that such a business model was in place, while the Publisher Defendants presented overwhelming evidence showing that Diesel did not aggressively engage in price competition.

[10] Moreover, any restriction on the ability to discount, bundle, or offer rewards points on Diesel's full catalog was not a function of the MFN in the Apple agency agreements, which only applied to front list prices. *See* Ex. 65 (SS000000001) ¶ 5 (S&S's agreement with Apple); Reply Declaration of Yehudah L. Buchweitz In Support of

B.  *Any Harm Caused By the Product Outage Was Not Material and Does Not Constitute Antitrust Injury*

To support its claim of causation, Diesel points to a dip in its revenues following the adoption of agency.[11]  This initial drop, however, is consistent with the decline in revenues Diesel experienced in the quarter immediately before the adoption of agency.  Opp. at 19.  As noted below, that decline prior to agency and the numerous other challenges Diesel faced collectively forced Diesel out of the market.  *See* Section II, *infra*.

Nevertheless, Diesel points to this drop and claims that it suffered an antitrust injury, both because of the elimination of price competition and because of the product outage.  But, the harm Diesel allegedly suffered as a result of the product outage could not amount to an antitrust injury because that harm does not flow from the alleged antitrust violation.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (holding that antitrust injury must "flow[] from that which makes the defendants' acts unlawful").  The purported purpose of the alleged conspiracy was to compel Amazon to move to agency to eliminate its below-cost pricing for trade e-books.  Opp. at 3, 16.  The product outage, however, did nothing to reduce the major retailers' power over e-book pricing.  Instead, it was one of many factors entirely unrelated to agency pricing that caused Diesel to fail.

Diesel tries to argue that the product outage can give rise to an antitrust injury because the outage was a "foreseeable corollary" that was "inextricably intertwined" with the alleged

---

Publisher Defendants' Motion for Summary Judgment ("Buchweitz Reply Decl.") Ex. 1 (APLEBOOK00384732) ¶ 5 (Hachette's agreement with Apple); Buchweitz Reply Decl. Ex. 2 (APLEBOOK00384792) ¶ 5 (Penguin's agreement with Apple); Buchweitz Reply Decl. Ex. 3 (APLEBOOK00384807) ¶ 5 (Macmillan's agreement with Apple); Buchweitz Reply Decl. Ex. 4 (APLEBOOK00384833) ¶ 5 (HarperCollins' agreement with Apple).  Restrictions on the use of bundles or reward programs appeared only as part of the Publisher Defendants' separate agreements with Amazon.  *See* Ex. 66 (SS00027582) ¶ 4 (S&S's agreement with Amazon); Buchweitz Reply Decl. Ex. 5 (HBG HC 000001) ¶¶ 4, 6 (Hachette's agreement with Amazon); Buchweitz Reply Decl. Ex. 6 (PEN017162) ¶ 3 (Penguin's agreement with Amazon); Buchweitz Reply Decl. Ex. 7 (MAC 0005592) ¶¶ 5, 9 (Macmillan's agreement with Amazon); Buchweitz Reply Decl. Ex. 8 (AMZN-TXCID-0000543) ¶ 5 (HarperCollins' agreement with Amazon).  Therefore, Diesel has retreated from assigning blame to the one thing the Apple agency agreements actually affected—front list price—and its complaints about methods thereafter impacted by separate Amazon agreements are another step removed from the alleged antitrust violation.

[11] Dr. Ratliff also relies on Diesel's alleged downturn in year-over-year revenue growth around the same time as agency in his attempts to show causation.  Dr. Ratliff's reliance on these figures are equally misplaced, as discussed in Defendants' Motion to Exclude the Expert Opinion of James D. Ratliff and in Section II below.

conspiracy because "there would have been no imposition of agency without the conspiracy." Opp. at 16-17. But, the cases Diesel cites present facts that involve a direct relationship between the alleged anticompetitive conduct and the plaintiff's injury. For example, in *Blue Shield of Virginia v. McCready*, the alleged conspirators—a health plan and a group of psychiatrists—had purportedly agreed to a scheme that would exclude competing psychologists from receiving reimbursements under the health plan. 457 U.S. 465, 469-70 (1982). In reviewing a motion to dismiss on causation issues, and accepting the plaintiff's allegations as true, the Court determined that a patient of a psychologist had adequately pled causation because her injury—a loss of reimbursement from her health plan—was a direct result of the purported scheme. *Id.* at 483-84. Here, however, temporarily losing certain of the product is entirely unrelated to the injury resulting from the alleged conspiracy, an elimination of price competition and a rise in prices.[12] As proof, retailers were impacted by the transition to agency in drastically different ways. Indeed, numerous retailers did not experience prolonged outages, if they experienced any loss of product at all.[13] If the Publisher Defendants had lawfully changed from a wholesale to an agency model, as they maintain they did, the same outage resulting from that transition would have occurred. *See Brunswick*, 429 U.S. at 487-88 (holding that "respondents' injury was not of 'the type the statute was intended to forestall,'" where "[r]espondents would have suffered the identical 'loss'" if the same action had occurred by legal means). Thus, the harm from the product outage cannot constitute an antitrust injury.

---

[12] The other cases Diesel cites are also inapposite because they all involve an injury that is directly related to alleged antitrust violation, and not an unintended, unrelated side effect of that alleged conspiracy. Moreover, *In re Nexium Antitrust Litig.*, 42 F. Supp. 3d 231, 268-69 (D. Mass. 2014) actually granted summary judgment for several defendants because plaintiff failed to offer sufficient proof of causation. *Id.* at 275, 294-95

[13] Diesel concedes that Amazon had agreements with four of the five Publisher Defendants before agency was implemented. 56.1 Resp. ¶ 15; *see also* Opp. at 16 n.9. Moreover, co-plaintiff DNAML had a direct relationship with Hachette at the time agency was implemented, and therefore had no outage. Diesel, however, did not have direct relationships with publishers, so it had to wait for product until it signed "tripartite contracts." 56.1 Stmt. ¶¶ 69-71. Thus, Diesel suffered through the outage because of its wholesaler's failures and its own refusal to find a new wholesaler that had access to titles. *Id.* In any event, Diesel had signed agreements with two agency publishers within a month after agency was implemented and had signed agreements with all five publishers by October 2010. 56.1 Resp. ¶ 48.

## II. Diesel Presents No Evidence that Shows the Alleged Antitrust Violation Was a Material Cause of Diesel's Failure

Diesel offers no evidence to support its theory that Diesel's e-books business failed as a result of its inability to discount, bundle, or offer rewards programs following the adoption of agency pricing. The overwhelming contemporaneous record evidence, however, shows that Diesel's failure resulted from causes other than an inability to compete on price.

First, Diesel was struggling to stay afloat even before agency. Its market share had been nearly eliminated, and its business had begun its decline.[14] 56.1 Stmt. ¶¶ 44-47. For a year prior to agency, Diesel's revenues were stagnant, fluctuating between $90,000 and $130,000 per month. *Id.* at ¶ 46. And in the quarter before the start of agency, Diesel's revenues fell by $47,000, all while the e-book industry was booming. *Id.* at ¶ 46; Opp. at 19. In the year prior to agency, Amazon's revenues increased by 185% and Sony's revenues increased by more than 150%.[15] 56.1 Stmt. at ¶ 46. Diesel was on the path to failure before agency was even announced and thus, cannot establish but-for causation. *See Argus*, 801 F.2d at 43-45; Mot. at 18-20.

Second, as identified in the Motion for Summary Judgment, Diesel's own documents reveal that there were at least eighteen separate issues wholly unrelated to agency pricing that harmed Diesel's business and collectively caused Diesel to fail.[16] Mot. at 21-22. Diesel's explanations for these other causes generally fall into one of three categories: (1) This problem did not harm Diesel because its CEO testified after-the-fact in connection with this litigation that

---

[14] Diesel admits that its e-book market shrunk from 4.1% in January 2008 to 0.3% in March 2010 and that Amazon, Barnes & Noble, and Sony had captured 98% of the e-book market by March 2010 (56.1 Resp. ¶ 45; 56.1 Stmt. ¶ 45), but claims that this fact is misleading because the e-books market was growing so rapidly. Opp. at 14-15. But the major retailers' businesses were exploding, and they were capturing the new business as well as Diesel's former customers. 56.1 Stmt. ¶¶ 24-26. It was only a matter of time until Diesel was completely pushed out of the market.

[15] After filing its brief, Plaintiff filed an "errata" that indicated that it misplaced the line on its charts. While this change revealed Diesel's decline prior to agency, Diesel failed to change any of the now inaccurate statements in their opposition that claim that Diesel was on an "upward trajectory" until agency was adopted. *See, e.g.*, Opp. at 25. For example, the dip in Diesel's revenue no longer "coincides perfectly" with agency. Opp. at 18.

[16] Even if the court were to conclude that the product outage constituted an antitrust injury, which the Publisher Defendants maintain it does not (*see* Section I.B), Diesel still cannot defeat summary judgment. The seventeen other issues entirely unrelated to agency collectively were the material cause of Diesel's failure, not the product outage. Indeed, Diesel repeatedly told the Publisher Defendants that it had moved past any issues related to the product outage. 56.1 Stmt. ¶¶ 59-62.

it did not harm Diesel; (2) this problem did not harm Diesel because it existed prior to agency when Diesel was supposedly successful; or (3) this problem harmed Diesel but the impact was not substantial enough to put Diesel out of business. The first explanation fails because, as noted above, Redford's testimony cannot be credited in the face of contradictory contemporaneous evidence. The second explanation is belied by the evidence showing that Diesel's business had stagnated and had already begun its decline prior to agency. And, the third explanation misses the point; the aggregate of all of the independent causes collectively caused Diesel to fail. No one cause had to be the silver bullet.

Moreover, while these numerous issues are reflected in Diesel's contemporaneous correspondence, the record before the Court is devoid of any reference to Diesel's inability to discount, bundle or offer rewards. 56.1 Stmt. ¶ 17. Diesel admits as much, but states it was unnecessary to include such information in, *inter alia*, its offering memorandum. 56.1 Resp. ¶ 17. But, if the inability to use those tools was actually a material cause of harm to Diesel, then Diesel should have included that information to potential purchasers. It was not as though the offering memorandum was devoid of negative information; Diesel cited factors inhibiting its revenue growth and specifically pointed to: (1) competition by major retailers; (2) a drop in international sales; (3) Ingram's inability to secure all available titles immediately after agency; and (4) the payment of 10% on all e-book sales to Ingram because Diesel did not have direct relationships with many publishers, including four of the five Publisher Defendants. 56.1 Stmt. ¶¶ 15, 22, 66, 71. The myriad alternative causes not only would limit the amount of Diesel's damages (Opp. at 23-24), but, taken together, show that the alleged conspiracy did not cause Diesel to fail.[17] *See Greater Rockford Energy & Tech Corp. v. Shell Oil Co.*, 998 F.2d 391, 403-4 (7th Cir. 1993) (holding that numerous causes "[t]aken together" foreclosed plaintiffs from showing that they would not have suffered the same injury even if the alleged antitrust violation

---

[17] Diesel improperly represents that "the Publisher Defendants cannot, and do not claim, that any one of these 'causes,' independently or collectively, was a material cause of Diesel's failure." Opp. at 23. This is exactly what the Publisher Defendants claim, and they do so based on overwhelming evidence. *See* Mot. at 17-24.

had never occurred); *United Mag. Co. v. Murdoch Mag. Distribution, Inc.*, 393 F. Supp. 2d 199, 212 (S.D.N.Y. 2005) (granting summary judgment where "plaintiffs have failed to account for these other causes" of its alleged injury).[18]

Lastly, summary judgment is appropriate here because Diesel fails to disaggregate harm attributable to the alleged conspiracy from the independent causes of Diesel's harm.  The Second Circuit has held that a plaintiff's proof of amount of damages "must provide the jury with a reasonable basis upon which to estimate the amount of its losses caused by other factors."  *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378-79 (2d Cir. 1988).  Diesel's experts do not meaningfully account for the eighteen independent factors that contributed to Diesel's demise, which is fatal to Diesel's claims.  *See* Mot. at 23-24 (citing cases that grant summary judgment where plaintiff fails to account for other factors that caused plaintiffs harm); *see also Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150 (9th Cir. 2015) (where damages expert did not "separate the losses suffered as a result of [defendant's illegal] conduct from the total losses suffered by [plaintiff], it would have been impossible for a jury to estimate the lost profits attributable to [defendant's] conduct"); *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 472 F. Supp. 2d 385, 430-31 (E.D.N.Y. 2007) (granting summary judgment where plaintiffs' experts' "inquiry into the causes of their alleged lost sales and profits did not go beyond their belief . . . that price discrimination was the cause of their claimed damages").

## CONCLUSION

For the foregoing reasons, the Publisher Defendants respectfully request that the Court grant their motion for summary judgment.

---

[18] The cases Diesel cites do not support its argument that the alleged conspiracy was a material cause of Diesel's failure.  In *Zenith Radio Corp. v. Hazeltine Research, Inc.*, which was an appeal based on the trial record, the Court found that there was sufficient evidence at trial to find a causal relationship between the antitrust violation and Zenith's harm but relied on the deference owed to the trier of fact which weighed the direct evidence of the witnesses who testified as to the direct causal relationship.  395 U.S. 100, 121-25 (1969).  In *In re Flonase Antitrust Litig.*, the plaintiff provided direct evidence accounting for each other intervening cause, in deciding that there was a material fact issue as to causation.  798 F. Supp. 2d 619, 630-33 (E.D. Pa. 2011).  And, in *Discover Fin. Servs. v. Visa U.S.A.*, the court was merely considering whether to exclude an expert's testimony and did not consider the question of causation.  582 F. Supp. 2d 501, 504-5 (S.D.N.Y. 2008).

Dated: New York, New York
October 30, 2015

Respectfully submitted,

| | |
|---|---|
| /s/ Yehudah L. Buchweitz | /s/ Saul P. Morgenstern |
| James W. Quinn | Saul P. Morgenstern |
| Yehudah L. Buchweitz | Amanda C. Croushore |
| Jeff L. White | Margaret A. Rogers |
| WEIL GOTSHAL & MANGES LLP | KAYE SCHOLER LLP |
| 767 Fifth Avenue | 425 Park Avenue |
| New York, NY 10153-0119 | New York, New York 10022 |
| Tel.: (212) 310-8000 | Tel.: (212) 836.7210 |
| Fax: (212) 310-8007 | Fax: (212) 836-6333 |
| | |
| james.quinn@weil.com | saul.morgenstern@kayescholer.com |
| yehudah.buchweitz@weil.com | amanda.croushore@kayescholer.com |
| jeff.white@weil.com | margaret.rogers@kayescholer.com |
| | |
| *Attorneys for Defendant* | *Attorneys for Defendant* |
| *Simon & Schuster, Inc.* | *Penguin Group (USA) Inc.* |
| | |
| /s/ Michael Lacovara | /s/ Charles Scott Lent |
| Michael Lacovara | C. Scott Lent |
| Richard Snyder (*pro hac vice*) | ARNOLD & PORTER LLP |
| Samuel J. Rubin | 399 Park Avenue |
| FRESHFIELDS BRUCKHAUS DERINGER US LLP | New York, New York 10022 |
| 601 Lexington Avenue 31st Fl. | Tel: (212) 715-1784 |
| New York, NY 10022 | Fax: (212) 715-1399 |
| Tel.: (212) 277 4000 | |
| Fax: (212) 277 4001 | scott.lent@aporter.com |
| | |
| michael.lacovara@freshfields.com | *Attorneys for Defendant* |
| richard.snyder@freshfields.com | *HarperCollins Publishers LLC* |
| samuel.rubin@freshfields.com | |
| | |
| *Attorneys for Defendant* | |
| *Hachette Book Group, Inc.* | |

12

/s/ Joel M. Mitnick_____

Joel M. Mitnick
John Lavelle
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Tel.:      (212) 839-5300
Fax:      (212) 839-5599

jmitnick@sidley.com
jlavelle@sidley.com

*Attorneys for Defendants*
*Macmillan Publishers Inc., and  Verlagsgruppe*
*Georg Von Holtzbrinck GmbH*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **DIESEL EBOOKS, LLC**<br><br>      **Plaintiff,**<br><br> v.<br><br>**HACHETTE BOOK GROUP, INC.;**<br>**HARPERCOLLINS PUBLISHERS L.L.C.;**<br>**VERLAGSGRUPPE GEORG VON**<br>**HOLTZBRINCK GMBH; HOLTZBRINCK**<br>**PUBLISHERS, LLC d/b/a MACMILLAN; THE**<br>**PENGUIN GROUP, A DIVISION OF**<br>**PEARSON PLC.; and SIMON & SCHUSTER,**<br>**INC.**<br><br>      **Defendants.** | 14 Civ. 1768 (DLC) |

### CERTIFICATE OF SERVICE

  I, Joseph D. Adamson, an attorney, hereby certify and/or state on oath that the within Reply Brief and the documents submitted therewith, and the Declaration of Yehudah L. Buchweitz, dated October 30, 2015, and the documents submitted therewith, were served on all parties in the above-captioned action via electronic delivery on this 30th day of October, 2015.


  */s/ Joseph D. Adamson*

Joseph D. Adamson