UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
LAVOHO, LLC, successor in interest to  :
DIESEL EBOOKS, LLC,                     :
                                        :          14cv1768 (DLC)
                    Plaintiff,          :
                                        :          OPINION & ORDER
        -v-                             :
                                        :
APPLE, INC.; HACHETTE BOOK GROUP,       :
INC.; HARPERCOLLINS PUBLISHERS, LLC;    :
VERLAGSGRUPPE GEORG VON HOLTZBRINCK     :
GMBH; HOLTZBRINCK PUBLISHERS, LLC       :
d/b/a/ MACMILLAN; THE PENGUIN GROUP, A  :
DIVISION OF PEARSON PLC; and SIMON &    :
SCHUSTER, INC.,                         :
                    Defendants.         :
-------------------------------------- X

APPEARANCES:

For Plaintiff
Maxwell M. Blecher
Blecher Collins Pepperman & Joy P.C.
515 Figueroa St., Suite 1759
Los Angeles, CA 90071

For Defendant Hachette Book Group, Inc.
Michael Lacovara
Richard Snyder
Samuel J. Rubin
Freshfields Bruckhaus Deringer LLP
601 Lexington Avenue
New York, NY 10022

For Defendant HarperCollins Publishers, LLC
C. Scott Lent
Arnold & Porter, LLP
399 Park Avenue
New York, NY 10022

For Defendants Macmillan Publishers Inc., and Verlagsgruppe
Georg Von Holtzbrinck GmbH:
Joel M. Mitnick
John Lavelle
Dorothy Du

Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

For Defendant The Penguin Group:
Saul P. Morganstern
Amanda C. Croushore
Margaret A. Rogers
Kaye Scholer LLP
425 Park Ave.
New York, NY 10022

For Defendant Simon & Schuster, Inc.:
James W. Quinn
Yehudah L. Buchweitz
Jeff L. White
Weil, Gotshal & Manges LLP
767 Fifth Avenue, 25th Fl.
New York, NY 10153

DENISE COTE, District Judge:

Lavoho, LLC, the successor in interest to Diesel eBooks,
LLC (hereinafter, "Diesel") brings this action against five book
publishers, Hachette Book Group, Inc. ("Hachette"),
HarperCollins Publishers, LLC ("HarperCollins"), Macmillan
Publishers Inc. and Verlagsgruppe Georg Von Holtzbrinck GmbH
("Macmillan"), The Penguin Group ("Penguin"), and Simon &
Schuster, Inc. ("Simon & Schuster") (collectively, "Publisher
Defendants").  Pursuant to Section 1 of the Sherman Antitrust
Act, 15 U.S.C. § 1, and Section 340 of the Donnelly Act, N.Y.
Gen. Bus. Law § 340, Diesel seeks damages it asserts it
sustained due to the defendants' conspiracy with Apple Inc.
("Apple") to fix prices and reduce competition in the e-book

industry.[1]  Diesel's claims arise from discussions initiated by Apple in December 2009 with the Publisher Defendants to explore the terms under which e-books might be available for Apple's new device, the iPad, which Apple launched in January 2010.  As a result of these discussions, the Publisher Defendants implemented agency distribution agreements with e-book retailers with the purpose and effect of eliminating retail price competition and raising the retail prices for many e-books.

In 2011 and 2012, the U.S. Department of Justice ("DOJ"), various states, and class action plaintiffs filed antitrust lawsuits against the Publisher Defendants and Apple alleging violations of the Sherman Act.  While the Publisher Defendants settled these claims, Apple proceeded to trial and was found liable in July 2013.  United States v. Apple Inc., 952 F. Supp. 2d 638, 709 (S.D.N.Y. 2013).  Diesel filed this antitrust case in March of 2014 alleging that its business was predicated on discounting, and that the defendants' agency conspiracy had caused Diesel's demise.  Two other e-book retailers filed similar antitrust lawsuits in 2013 and 2014 against Apple and the Publisher Defendants.  The Court has dismissed these two lawsuits.  DNAML Pty, Ltd. v. Apple Inc. et al., No. 13-cv-6516 (DLC), 2015 WL 9077075 (S.D.N.Y. Dec. 16, 2015); Abbey House

---

[1] The plaintiff also brought this lawsuit against Apple.  The plaintiff and Apple have settled.

_Media, Inc. v. Apple Inc. et al._, No. 14-cv-2000, 2016 WL 297720
(S.D.N.Y. Jan. 22, 2016).

Following the completion of discovery, the Publisher
Defendants moved for summary judgment on the grounds that Diesel
cannot show antitrust injury and that Diesel has not shown that
its failure was caused by the agency conspiracy.  The motion is
granted.  The plaintiff has not offered evidence to show that it
has suffered antitrust injury arising from the Publisher
Defendants' conspiracy to eliminate retail price competition for
their e-books or from which a jury could find that that
conspiracy caused the failure of its business.

**BACKGROUND**

The following facts are undisputed or taken in the light
most favorable to the plaintiff.  Scott Redford founded Diesel
as an e-book retail store in December 2004.  Diesel sold e-books
through its website, built in part by its programing contractor
on top of an existing e-commerce infrastructure.  Its e-books
were apparently intended to be read by consumers principally on
their desktop computers.  Diesel did not purchase its e-books
directly from the Publisher Defendants at any time before the
initiation of the defendants' price-fixing conspiracy.  Instead,
it purchased its inventory from Ingram Digital ("Ingram"), a

wholesaler.[2]  As a result, Diesel was required to pay a fee to Ingram of 10% of an e-book's digital list price ("DLP"), which increased its costs.  Diesel would later tout its search engine optimization knowledge, fraud control, and platform scalability as the three keys to its early success.

**I. Diesel's Performance Prior to Agency**

Beginning in 2007, Diesel was faced with stiff competition. Amazon re-entered the e-book market at the end of 2007 and quickly became the dominant e-book retailer.  Amazon also introduced its popular e-reader device, the Kindle, in November 2007.  Amazon sold e-book versions of many hardcover books for $9.99, a price that was often well below Diesel's inventory cost for the book.

In 2009, Barnes & Noble re-entered the e-books market, and eventually adopted Amazon's $9.99 model for e-book versions of certain hardcover books.  Barnes & Noble then introduced its e-reader device, the NOOK, in November 2009.

Prior to the implementation of agency pricing in the second quarter of 2010, Diesel's performance was variable.  While

---

[2] Initially, Ingram provided Diesel with e-books in multiple proprietary formats, including Microsoft Reader, Palm, and Adobe.  In 2008, Diesel also added a mobile format through the company Mobipocket, although Mobipocket's formatting was later purchased and re-packaged for Amazon's e-reader.  Diesel also became a retailer for the self-publishing platform Smashwords and partnered with Google for access to its open domain content.

Diesel was profitable in 2008 and 2009, its net income margins began dropping in the second quarter of 2009, reaching -5.2% in the first quarter of 2010.  Although Diesel's revenue tended to grow each quarter, its monthly revenues were never large.  For example, it fluctuated between approximately $90,000 and $130,000 from April 2009 to March 2010.  Diesel's year-over-year growth rate also fluctuated, with significantly decreased growth in the months prior to the adoption of the agency model for distributing e-books.[3]  Diesel also struggled to maintain market share prior to the beginning of the agency period.  Its share of the market decreased from about 4.1% in January 2008 to 0.3% in March 2010.  In contrast, by March 2010, Amazon, Barnes & Noble, and Sony had captured 98% of the e-book market.

Diesel attributed some of its financial challenges to an inability to compete on price with major retailers like Amazon and Barnes & Noble.  As explained above, Diesel purchased its e-books through a wholesaler and therefore had higher inventory costs.  It also operated with a higher profit margin.  Accordingly, the prices of Diesel's e-books were, on average, higher than those of Amazon or Barnes & Noble.  Redford has explained that Diesel could not sell ebooks at below cost prices

---

[3] Year-over-year growth percentages, the plaintiff's preferred measurement, compare revenue from a given month to revenue from the corresponding month of the previous year.

to the same extent as its mega competitors, that Diesel had

"somewhat ceded the whole new release business to Amazon [and]

the big guys," and that "as far as what Amazon was doing, no, we

didn't do that.  We couldn't afford to do that."  In fact, on

the day that the agency distribution system began for many of

the Publisher Defendants, April 1, 2010, Diesel published a blog

post noting that

> Many among our multi-billion dollar competition have
> been selling [New York Times bestsellers] for $9.95,
> eating 'customer acquisition' costs of $5.62 per
> title. . . .  As an independent, the Diesel eBook
> Store simply does not have the capital to keep up
> with our mega competitors on such a grand scale.  We
> would literally be out of business in less than a
> few months.

Diesel faced additional competitive challenges in these

early years.  Diesel lacked its own proprietary e-reader, unlike

Amazon and Barnes & Noble.  Customers that purchased e-books

from Diesel could not read books on Amazon's Kindle, for

example, due to the Kindle's proprietary "walled garden."[4]

Diesel does not dispute that the existence of proprietary e-

reader devices made it difficult for it to compete both before

and after the implementation of agency pricing.  Diesel also did

not have any mobile apps that would have allowed its e-books to

---

[4] Only unencrypted e-books purchased from Diesel could be read on
a Kindle, and even then customers had to convert Diesel's e-book
files through an eleven step process that included physically
connecting a Kindle to a computer with a USB cable.

be read on smart phones or other portable mobile devices.
Diesel did not even start to develop an app until June 2011,
well after agency pricing was implemented.

In addition, Diesel struggled with the development of its
website.  Because its site was outdated, Diesel sought to build
a "whole new platform" in November 2009.  By late October 2010,
the new site had still not been launched.

## II. The Conspiracy Period

The conspiracy claims that underlie this lawsuit arise from
the discussions which Apple initiated in December of 2009 with
the Publisher Defendants to explore the terms under which the
publishers' e-books might be available for Apple's new device,
the iPad, which Apple launched on January 27, 2010.  The iPad
had the ability to function as an e-reader and to offer the
iBookstore.  Each of the Publisher Defendants agreed to sign an
agency distribution agreement with Apple and supply it with
their e-books.  Because of the terms of their agreements with
Apple, each of the Publisher Defendants then required other e-
book retailers to execute similar agency agreements.

Under the agency model, a publisher is the seller of record
and sets the retail price for an e-book.  Retailers sell the e-
book as the publisher's agent, earning a commission on the sale
price.  The Publisher Defendants had previously sold e-books
through the wholesale model, whereby the publisher sold an e-

book for a wholesale price and the retailer set the retail price.  With the arrival of the agency model, Amazon, Barnes & Noble, Diesel, and every other e-retailer lost the ability to discount those e-books for which the Publisher Defendants sought to control the retail price.  For example, the agency agreement between Hachette and Apple applied agency pricing to e-book equivalents of frontlist hardcover books.

The agency model went into effect for most of the Publishers Defendants as of April 3, 2010.  The purpose and effect of this conspiracy was to eliminate retail price competition for many e-books and to raise the retail prices for those e-books.  As a result of the agency model, e-book retailers purchasing directly from the Publisher Defendants were guaranteed a commission on the e-books they sold.  The Publisher Defendants' agency agreements set this commission at 30%.[5]

**III. Diesel Welcomes Agency Pricing**

Diesel publicly welcomed agency pricing after it was implemented.  In its April 1, 2010 post to the Diesel eBook Store Blog, Diesel gave its "quick take" on what it characterized as the "ongoing madness."  It began by reporting

---

[5] With the adoption of the agency model and the substantial commission payments, the Publisher Defendants actually reduced their revenue from sales of many e-books.  They anticipated, however, that by raising the retail prices of e-books, they would protect their sales of hardcover books, from which they had traditionally profited.

that "[o]ddly enough, the agency model *might* potentially have a very positive benefit for Diesel -- mostly because, lately, our sales have been shifting towards the Indies."[6]  Diesel frankly acknowledged that it could not compete on price with deep-pocketed e-book retailers:

> As an independent, the Diesel eBook Store simply does not have the capital to keep up with our mega competitors on such a grand scale.  We would literally be out of business in less than a few months.  Under the agency model, the playing field would definitely be leveled so that we can compete against stores with a lot more resource$. [sic]  Practically overnight, the quality and personal rapport that's inherent in the eBookstore experience becomes all the more important.

Diesel added, however, that customers and authors would be harmed by the switch to an agency model.  As an example, it noted that "one of the favorite customer practices -- Bundling -- will be severely limited.  (Take note that, at the moment, Diesel has no plans to discontinue its loyalty or coupon programs.)"

Five months later, in a second blog post of November 2, 2010, Diesel still felt that the switch to the agency model had benefitted it and other small e-book retailers.  The post stated that Diesel and other small e-book retailers "don't have to lose their shirts through price-cutting, anymore" and that "with

---

[6] "Indies" in this context refers to independent publishing houses.  It does not refer to the Publisher Defendants.

everyone on the same [pricing] playing field, providing great customer service is now much more valuable."  The November blog post also noted three negative consequences from the switch. They were the challenges of collecting sales tax, the demand by the Publisher Defendants that their e-books be sold only in the United States, and the limitation on promotions, which "simply takes the fun out of our business" and requires Diesel to explain to its customers why many promotional benefits are not available for the Publisher Defendants' titles.  The post concluded with an explanation of why the economics of the agency model made it imperative for small retailers to develop direct contracting relationships with the Publisher Defendants to avoid the fees collected by wholesalers.

In the months that followed, Diesel continued to report that it had had very little trouble adjusting to the agency model.  For example, in a February 2011 email to his investors, Redford projected that Diesel would have nearly $1 million in e-book sales for 2011.  That June, he wrote that Diesel had "survived the agency storm, found it's [sic] niche and invested heavily in infrastructure that easily accommodates all the retail requirements of selling online -- now and in the future." Redford made similar email statements in August and October 2012 to representatives of HarperCollins and Simon & Schuster, noting

that Diesel had "weathered the agency storm" and had "[p]lans to expand our presence."

If Redford was concerned about the effect of agency pricing on Diesel's business model, he failed to mention it during his efforts to sell Diesel in 2012.  Redford prepared a document for potential investors that provides significant insight into the nature of Diesel's business and Diesel's understanding of its competitive environment.  The document is titled Confidential Memorandum ("2012 Memorandum"), has been provided in discovery in two slightly different versions, and runs for about twenty-nine pages in the longer version.  Notably, the 2012 Memorandum does not describe Diesel's business as premised on discounting. Nor does it complain that the elimination of retail price competition for the Publisher Defendants' e-books had a negative impact on Diesel.  Instead, the document touts Diesel's success in negotiating direct contracts with "all 8 Agency publishers,"[7] thereby eliminating the need to pay fees to wholesalers.  It explains, however, that to execute Diesel's long term strategy, Diesel required additional resources to "position itself outside the fierce pricing battles between the two major players in the market place (Amazon and Barnes & Noble)."

---

[7] Later in the document Diesel explains that it had direct contracts with Random House, Macmillan, and four other independent publishing houses and was in the final stages of negotiations with two larger agency publishers.

In describing the "keys" to its early success, the 2012
Memorandum describes Diesel's platform and fraud control
features, but makes no mention of any discounting practices.  In
its discussion of the advent of the agency model, Diesel
represents that it quickly deployed the infrastructure necessary
to collect sales taxes and to enforce sales restrictions by
geography.  Diesel makes no mention of the loss of the ability
to discount.  The 2012 Memorandum also identifies Diesel's
largest sales, amounting to roughly one-third of its e-books, as
"[r]omance."  It also explains that 30% of Diesel's business was
international.

In a lengthy description of its technology platform, which
was developed by Upshot Commerce, Diesel lists features of the
Upshot system that were available to be used and those Diesel
was actively using.  Included in those under active use are a
loyalty points program, daily deals and flash sales, and a gift
certificate and coupon module.  Among the customized modules
created for Diesel is an eBook Bundling Module.  Diesel brags
about the nimbleness of its platform, particularly its ability
to let Diesel set up unlimited "storefronts" and manage content
and customers across each from one place.  At the end of its
praise for the platform, Diesel mentions the platform's utility
with "merchandising (sales, promotions, coupons, gift certs,
bundles, etc . . . )."  In a discussion of merchandising

13

features, Diesel lists pricing options that can be used to offer discounts and special schemes to loyal customers, including a "Robust Couponing System" and "Dollar, Percentage and/or Shipping Discount."

One page of the presentation is devoted to "Bundles." Diesel describes the platform's ability to "'shrink wrap' up to six digital eBook files by series, theme, characters, time period or author resulting in enhanced customer convenience and cost-savings" as a "unique feature" of its platform.  It explains that the creation of bundles that cross imprints and authors can expose customers to new authors.  A sample bundle featuring four books united by the theme "Dragons Are A Girl's Best Friend" is displayed under this text.  The price is $14.91 with "reward money" of $0.52.

The 2012 Memorandum devotes over two pages to recent, significant developments in e-book distribution, specifically the adoption of the agency model and publishers' enforcement of territory restrictions.  It notes that the publishers set retail prices through the agency model and also restricted retailers from discounting agency titles "in any way including bundling, coupons and sales promotions."  Diesel reported that the agency system and territory restrictions were "defining moments for Diesel," but that its platform empowered it to "quickly adapt."

The 2012 Memorandum further predicts an e-book revolution

and explains why Diesel was "uniquely positioned to seize" new markets.  Diesel describes "under-served niche" markets, genre stores, alternate sales channels, book clubs, and email marketing as "immediate opportunities."  Diesel goes on to praise its erotic romance division ("eBooks Eros").  In particular, Diesel states that it is "bullish" on the prospect of eBook Eros establishing itself as "a blue-chip profit center and world-wide, top of mind destination for anyone seeking erotic romantic fiction and non-fiction."

Noticeably, the 2012 Memorandum makes no mention of Diesel's inability to discount as a factor that inhibited Diesel's revenue growth or as a potential risk factor for Diesel's business.  Rather, Diesel lists the following four factors as the sources of downward pressure on Diesel's revenue growth: (1) market share competition from Amazon and Barnes & Noble; (2) a drop in international sales; (3) Ingram's inability to secure a full catalogue of available titles, and (4) the 10% fee charged by Ingram on all e-book sales to Diesel.  In fact, the 2012 Memorandum highlights Diesel's challenge in competing with Amazon and Barnes & Noble in that part of the e-book market where retail price competition remained.  It reported that the "focus" of those two competitors on "capturing market share at any cost" was a downward driver of revenue, a factor Redford attributed to below-cost pricing creating thinner margins.

On the positive side, Diesel hailed the DOJ ruling requiring the Publisher Defendants "to cease their pricing controls under the agency model" as an event with "positive implications for Diesel."  It explained that the big six publishers were at war with Amazon and its low pricing, which motivated the publishers to enter into direct relationships with independent retailers like Diesel.  Diesel's ability to purchase e-books directly from those publishers would eliminate "overnight" the 10% fee Diesel paid to its wholesaler and thereby reduce the cost of goods.  Diesel expressed the hope as well that the post-agency contracts with publishers would open up international markets to Diesel.

The absence of any reference to the Publisher Defendants' adoption of the agency model in Diesel's risk disclosures is not unusual.  No contemporaneous document reflects that Redford was concerned in the period between 2010 and 2012 about the decision by the Publisher Defendants to alter their distribution model in this way and eliminate retail price competition for certain e-books.  Quite the contrary, the 2012 Memorandum suggests that Diesel could not compete where retail price competition remained, and that it was seeking to position itself outside of any fierce pricing battle.

**IV. Diesel's Bundling and Rewards**

As reflected in the 2012 Memorandum, at some point Diesel

began to offer "bundles" of e-books to its customers.  The
bundles consisted of groups of up to six digital eBook files by
series, theme, characters, time period, or author sold to
customers as a bulk package.  In the 2012 Memorandum, which is
the first Diesel record that mentions Diesel's bundling, Diesel
touted e-book bundling for its "enhanced customer experience and
cost savings,"[8] its ability to "expose[] customers to new authors
they may not buy outside of a bundle," and its "capability to
accelerate increased market-share among high volume eBook
purchasers."  Diesel had no common discount available to
customers off the DLP of bundled books, and no system for such
discounting was ever set out in any contemporaneous documents.[9]
Indeed, during his April 2015 deposition, Redford could not
provide any specific details of how Diesel discounted its
bundles.  Diesel also did not produce transaction-level data
that would have allowed for the calculation of discounts off of
DLP for bundled books.

        Diesel also had a loyalty and coupon program through which
customers could apply earned rewards points towards future

---

[8] The reference to cost savings is a reference to the savings
Diesel achieved in its acquisition of e-books from wholesalers.
Diesel does not suggest that this refers to any price discounts
available to readers.

[9] In his 2015 affidavit, Redford explains that a "large portion
of a bundles discount was passed to the customer via reward
points."

Diesel e-book purchases.  Customers could receive $1.5 to $3 if they proposed an idea for a new bundle of e-books that Diesel adopted.  They could also earn 15 cents for every approved book review.  Customers could also accumulate rewards points with each purchase of a Diesel bundle of e-books of, on average, 3.5 cents per bundle.  The transaction-level data produced by Diesel, however, only provides information on rewards and bundles from September 2010 onward.  Diesel has not presented data through an expert or otherwise to show the significance of its bundling program to its revenue stream or the extent to which its customers earned (from purchases of bundles or otherwise) or redeemed rewards points.  It has provided no internal documents in opposition to this motion that track or report such figures.

## V. Challenges for Diesel in the Post-Agency Period

Although Diesel expressed enthusiasm about the Publisher Defendants' adoption of the agency model, it encountered certain significant difficulties during the transition period.  First, because Diesel purchased e-books from Ingram, it depended on Ingram to execute agency agreements with the Publisher Defendants and make e-books available to Diesel under those new terms.  That did not happen immediately.[10]  As a result, Diesel

---

[10] Among other things, Ingram was required to collect sales taxes in connection with the sale of the defendants' e-books and it

lost access to about half of its inventory on April 1, 2010.  It took up to six months for agreements to be executed with the Publisher Defendants to allow Diesel to regain its full inventory.  Diesel eventually signed agency agreements with all five of the Publisher Defendants: Penguin on April 28, HarperCollins on May 4, Hachette on July 28, Simon & Schuster on August 23, and Macmillan on October 14, 2010.  With the exception of the Macmillan agency agreement, which was made directly with Diesel, these agreements were tripartite contracts with Ingram, the Publisher Defendants, and Diesel.

This loss of inventory, even though temporary, was very damaging to Diesel's business.  In March 2012, in response to an article discussing a potential DOJ antitrust suit against Apple, Redford wrote that "[r]eal justice would have Diesel as part of the settlement -- restitution for losing half our inventory overnight on April 1st for six months.  We still haven't recovered from that."  Furthermore, in its 2012 Memorandum, Diesel cited Ingram's inability to provide Diesel with e-books immediately after the transition to agency pricing as a phenomenon that created downward pressure on Diesel's revenues.

---

had to set up systems to do so.  This apparently delayed Ingram's execution of agency agreements with the Publisher Defendants.

This loss of inventory during the transition to the agency model was not the only challenge that Diesel faced in the period of 2010 and beyond.  Diesel never brought to market any mobile apps or developed an e-reader.  While Diesel obtained a commitment to fund the development of its own e-reader in early 2010, the proposed e-reader was not set to be available until the end of 2011 and ultimately the funding for the e-reader was withdrawn.  Diesel began developing an app for its e-books in June 2011.  Redford believed at the time that the absence of a mobile app was "a gaping hole" in Diesel's offerings.  But, Diesel's Kindle Fire app remained in limbo for years without approval or rejection.  While Diesel's Apple app was ultimately approved by Apple in May of 2012, Diesel abandoned it.  Long before approving the app, Apple had modified its app policy to impose a 30% commission, payable to Apple, on every e-book purchased through an app.[11]

During this same period, Diesel continued to face repercussions from the delayed launch of its new website.  By late October 2010, Redford complained to Diesel's programmer that he had "shelled out over $90k for this site that was budgeted to come in at $70k and we've yet to sell an ebook."  Redford also noted that he had "stopped marketing the old site

---

[11] In 2012, Redford estimated that this project cost Diesel over $20,000.

months ago" and that "business has dropped accordingly."[12]  This
delay also pushed back other important Diesel projects because
investors were waiting for the launch of the website before
investing in new features.  Even when launched at the end of
2010, the new website experienced problems.

Perhaps even more significantly, Diesel lost access to
international sales.  Diesel knew from at least 2009 that
publishers imposed geographic limits on the sale of certain of
its e-books, restricting those sales to customers within the
United States.[13]  Publishers' enforcement of territorial
restrictions only increased in the post-agency period, when
publishers became the sellers of record.  Since over 30% of
Diesel's business had been international, Diesel's revenue
dropped.  To recapture this revenue Diesel elected to
intentionally breach the territory restrictions in its
contracts.  Diesel labelled this program "Project Mayhem."  The
gambit worked temporarily, increasing Diesel's revenues.  On May
28, 2013, however, Ingram notified Redford that Penguin had

---

[12] Redford argues that his 2010 emails were filled with
"hyperbole" to create urgency.

[13] For example, on January 16, 2009, Diesel received a notice
from Ingram that no Hachette titles may be sold to customers
with billing addresses outside of North America.  Ingram also
notified Diesel on April 17, 2009 that seven publishers were
enforcing their territorial restrictions, including Hachette and
Penguin.

found some of its American titles on Diesel's Australian site.
Penguin demanded that Diesel immediately pull all Penguin titles
off of Diesel's foreign sites.  Redford forwarded the Ingram
email to his programmer with an emphatic order: "shut down
mayhem right now please."

Diesel also struggled to comply with sales tax reporting
requirements imposed by publishers that adopted agency pricing.
In August 2010, Ingram warned Diesel that it needed to resolve
the problems with its tax reporting to get renewed access to e-
books.  Diesel's difficulties with tax reporting issues
continued into 2012, with Redford writing then that the problem
was "getting out of control."

By March of 2014, Diesel recognized that its search for an
acquirer was futile.  The principal candidate that Diesel had
been pursing for over a year informed Diesel that it would not
make the investment.

## VI. Diesel Brings Lawsuit against Publisher Defendants

Diesel's did not join the initial wave of antitrust
litigation filed against Apple and the Publisher Defendants.
Beginning on August 9, 2011, class action complaints were filed
against the defendants alleging violations of the Sherman Act,
culminating in a consolidated amended class action complaint
being filed on January 20, 2012.  In re Elec. Books Antitrust
Litig., 859 F. Supp. 2d 671, 680 (S.D.N.Y. 2012).  On April 11,

2012, DOJ and various States filed antitrust lawsuits against the defendants.  The Publisher Defendants eventually settled these actions.  Apple, however, proceeded to trial and was found liable in July 2013.  Apple Inc., 952 F. Supp. 2d at 709.

It was not until Apple was found liable in 2013 that e-book retailers filed individual lawsuits against Apple and the Publisher Defendants.  Three such lawsuits were filed in 2013 and 2014, each alleging that the retailer was directly harmed by the e-book price-fixing conspiracy.  DNAML Pty, Ltd. ("DNAML") filed its complaint on September 16, 2013; Diesel filed a complaint on March 14, 2014, one day after it learned it would not be acquired by an investor; and Abbey House Media, Inc. d/b/a BooksOnBoard ("BOB") filed its complaint on March 21, 2014.

Diesel's complaint asserts two claims: (1) for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; and (2) for violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340.  After it reached a settlement with Diesel, Apple was dismissed from the case on April 21, 2015.  On September 18, 2015, the Publisher Defendants filed a joint motion for summary judgment. They argue that Diesel cannot show antitrust injury and that Diesel's failure was not caused by the alleged conspiracy.  The

motion was fully submitted on October 31.[14]

## DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Smith v. Cty. of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Gemmink v. Jay Peak Inc., 807 F.3d. 46, 48 (2d Cir. 2015).

Once the moving party has asserted facts showing that the non-movant's claims or affirmative defenses cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by

---

[14] There are also two other motions pending: the plaintiff's September 18 motion for partial summary judgment on various counterclaims filed by the Publisher Defendants that was fully submitted on October 31; and the defendants' October 30 motion to exclude the expert opinions of Dr. James D. Ratliff that was fully submitted on December 4.  This Opinion does not reach these two motions.

affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

To succeed on its claims, Diesel must show that it suffered an antitrust injury.  Gatt Commc'ns, Inc. v. PMC Associates, L.L.C., 711 F.3d 68, 81 (2d Cir. 2013).  Proving that a plaintiff has suffered an antitrust injury requires, among other things, proof that it suffered "the type of injury contemplated by" the antitrust laws.  Cash & Henderson Drugs, Inc. v. Johnson & Johnson, 799 F.3d 202, 214 (2d Cir. 2015) (citation omitted).  In particular, the plaintiff must demonstrate that its injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."

Atl. Richfield Co. v. USA Petroleum Co. ("ARCO"), 495 U.S. 328,
334 (1990) (citation omitted); see Gatt Commc'ns, Inc., 711 F.3d
at 76.  In other words, the plaintiff must show that any
business loss it suffers "stems from a competition-reducing
aspect or effect of the plaintiff's behavior."  ARCO, 495 U.S.
at 344.  Accordingly, a plaintiff cannot establish antitrust
injury where it "actually tended to benefit" from the alleged
conduct.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475
U.S. 574, 586 (1986).

Diesel must also establish a causal link between the
violation of the law and its claimed injury, specifically that
"the injuries alleged would not have occurred but for" the
defendants' antitrust violation.  In re Publ'n Paper Antitrust
Litig., 690 F.3d 51, 66 (2d Cir. 2012) (citation omitted); see
also Argus Inc. v. Eastman Kodak Co., 801 F.2d 38, 41 (2d Cir.
1986).  A lack of causation in fact "is fatal to the merits of
any antitrust claim."  Lotes Co. v. Hon Hai Precision Indus.
Co., 753 F.3d 395, 415 n.8 (2d Cir. 2014) (citation omitted).
To show causation, "[i]t is enough that the illegality is shown
to be a material cause of the [antitrust] injury; a plaintiff
need not exhaust all possible alternative sources of injury in
fulfilling [its] burden of proving compensable injury" since an
antitrust defendant's unlawful conduct "need not be the sole
cause of the plaintiffs' alleged injuries."  In re Publ'n Paper

Antitrust Litig., 690 F.3d at 66 (citation omitted).  Rather,
"to prove a causal connection between the defendant's unlawful
conduct and the plaintiff's injury, the plaintiff need only
demonstrate that the defendant's conduct was a substantial or
materially contributing factor" in producing that injury."  Id.
(citation omitted).

New York's antitrust statute, the Donnelly Act, is
"construed in light of Federal precedent and given a different
interpretation only where State policy, differences in the
statutory language or the legislative history justify such a
result."  Gatt Commc'ns, Inc., 711 F.3d at 81 (citation
omitted).  The parties agree that their arguments apply equally
to Diesel's claims under the Donnelly Act as to its claims under
the Sherman Act.

## I.   Diesel as a Discounter

The plaintiff's description of its business and its theory
of injury, as stated in its complaint, are as follows.  It
alleged that it was competing with Amazon "on price" and could
no longer do so due to the conspiracy.  It asserted in one place
that the "cornerstone of its business model was discounted
bundling," and in another that its business model was
"predicated on its discounting, bundling, and its rewards
program."  "Diesel would discount the cost of each book sold in
the bundle and would sometimes partially defer its profit from

27

the bundle by depositing reward points in customers' accounts."
Under Diesel's rewards program, "consumers received on average
$.035 cents for every $1.00 spent."  When coupled with its
bundling discounts, this rewards program made Diesel's prices
"highly competitive; its e-book prices were around or below the
prevailing rate."  But, the defendants' conspiracy

> forced Diesel in line with everyone else.  It became
> unable to compete by distinguishing itself through
> offering attractive prices, bundling, rewards
> programs, or offering attractive cross-platform
> support.  Without the ability to distinguish itself in
> any meaningful way, Diesel had no chance of competing
> with several large international conglomerates
> offering the same items at the same prices that were
> prescribed by an industry-wide conspiracy.

Diesel has offered no evidence that its business model
was premised on distinguishing itself through price competition
that brought its rates "around or below the prevailing rate,"
that it sold e-books it placed in bundles at a discount, or that
these discounts made its e-book prices highly competitive when
coupled with its rewards program, much less that this was the
cornerstone of its business.  As described below, the plaintiff
has failed to offer evidence that it desired to, believed that
it could, or ever did, compete on price with major e-book
retailers when selling the Publisher Defendants' titles.  In
short, Diesel has not offered evidence to show that it suffered
an antitrust injury from a conspiracy that eliminated retail
price competition for the Publisher Defendants' titles or to

raise a question of fact that that conspiracy caused the failure
of its business.

Drawing liberally from Diesel's own documents, the
Publisher Defendants have offered overwhelming evidence that
Diesel's business was not predicated on price competition.
Diesel did not seek to match or beat Amazon and Barnes & Noble's
prices prior to or, for those book titles where price
competition remained available, even after the advent of agency
pricing.  Diesel's e-book prices were higher than those of
Amazon or Barnes & Noble, indeed, on average, substantially
higher.  This is true even when every discount, promotion, and
rewards program that Diesel may have employed is taken into
account.  Diesel has offered no analysis of its sales data to
suggest otherwise.  This evidence of high prices -- drawn from
Diesel's own records -- is entirely consistent with Diesel's
contemporaneous statements about the nature of its business and
the environment in which it was competing.  Diesel acknowledged
that it did not have the capital to keep up with the pricing of
what it labelled its "mega competitors."

As its 2012 Memorandum explains, Diesel hoped to
distinguish itself by providing niche services that would not
require it to compete on price.  As a consequence, it was
building an inventory with books from independent publishers and
was dependent to a large degree on foreign sales.  Even its

29

bundling program was touted as a way to enhance a customer's experience, to expose the customer to new authors, and hopefully to increase Diesel's market-share by building a following among high volume e-book purchasers.

It is undisputed, of course, that the switch to the agency model eliminated Diesel's ability to include many (if not all) of the Publisher Defendants' e-books in a bundle associated with a rewards program.  But, Diesel has not offered any evidence to show that this limitation created a hardship for it or impacted it negatively at all.  According to Diesel's own documents from 2010 to 2012, the switch to agency pricing levelled the playing field and benefitted it.  Apparently, Diesel believed at the time that any disadvantage that Diesel might suffer from not being able to include one of the Publisher Defendant's titles in a bundle was more than offset by its ability to be more competitive with the retail prices of any other e-retailer, whether the retailer was large or small.  Because Diesel has not offered any analysis of its own sales records, its bundling program, or its rewards system, however, a fact finder would be left to speculate on all of this.  That absence of proof is sufficient by itself to require that summary judgment be awarded to the Publisher Defendants.

Diesel's decision to ignore its own sales data and business records is not surprising.  Diesel's disclosures to investors

stand at odds with its claim in this lawsuit that discounting or
price competition was central to its business.  It openly
welcomed the agency pricing model when it arrived and as late as
a year after its arrival.  See Matsushita Elec. Indus. Co., 475
U.S. at 586 (a plaintiff cannot establish antitrust injury where
it "actually tended to benefit" from the alleged conduct).[15]
Even as late as 2012, Diesel represented that it had easily
adjusted to the agency model and had plans to expand.

     In opposition to this motion for summary judgment, Diesel
has shifted its theory of injury and causation from that
proffered in its complaint.  Diesel relies principally on two
sources of proof in support of its current contention that the
price fixing conspiracy harmed Diesel because its business was
predicated on discounting.  Neither line of evidence succeeds,
however, in demonstrating an antitrust injury or in raising a
question of fact that requires a trial on the issue of
causation.  Indeed, in the course of presenting its opposition
to this motion, Diesel largely concedes that it was not a
discounter, as that term is commonly understood, and could not
have succeeded in a but-for world by offering or even meeting

---

[15] Diesel argues that it did not fully understand the
implications of the agency pricing model when it wrote the April
1, 2010 blog post.  But, that post is just one of several
similar assessments that Diesel made over the years that
followed the adoption of agency pricing.

the lowest prevailing retail prices for e-books.[16]   It argues

instead that the elimination of the options of bundling and

rewards programs for the Publisher Defendants' e-books

constituted an antitrust injury to its business and entitles it

to recover damages for the demise of its business.

First, Diesel relies on the conclusion by its expert, Dr.

James Ratliff, that Diesel was harmed by the implementation of

agency pricing.  In his initial expert report, filed on behalf

of the three plaintiffs,[17] Dr. Ratliff reasoned that Diesel had a

track record of employing promotional techniques that were

restricted by the Publisher Defendants' imposition of agency.

This confirmed, for him, that its business was well suited to

the application of these promotional techniques and would have

---

[16] To the extent the term "discounting" is meant to convey that
Diesel intended to or ever did sell the Publisher Defendants' e-
books during the pre-agency period at prices at or below the
prevailing retail prices (as opposed perhaps to prices above
prevailing rates but lower than Diesel's customary high prices),
the Publisher Defendants have offered evidence that Diesel did
not do that and Diesel has offered no evidence that it did.
Moreover, the rewards program that Diesel made available to
customers who bought bundles of certain Diesel e-books is the
only "discounting" regime for which there is some evidence.  But
again, Diesel has not shown that its rewards program was ever
large enough to bring its retail prices even close to the
prevailing retail prices for e-books.

[17] Dr. Ratliff's report was filed on behalf of BOB, DNAML, and
Diesel.  In moving for summary judgment, the Publisher
Defendants submitted the opening and rebuttal expert reports by
Dr. Ratliff as well as the expert report from defense expert Dr.
Dennis Carlton.

benefitted from the continued freedom to employ them.  The
Publisher Defendants' expert pointed out, in response, that Dr.
Ratliff had not provided any quantitative evidence related to
Diesel's typical discounts and the extent of Diesel's rewards
and bundling promotions.  In addition, Diesel did not produce
transaction-level data from which one could calculate Diesel's
average retail prices as a percent of list price, the extent of
its rewards program, or the share of e-books sold under bundles
before the introduction of the agency model.  In his rebuttal
report, Dr. Ratliff does not suggest that he has any evidence to
fill these evidentiary gaps.  Instead, he simply reasons that
retail prices can serve as a marketing tool for retailers even
when a retailer does not offer a lower price for a product than
another retailer.  In Dr. Ratliff's view, simply reducing a
seller's previous price or highlighting a seller's discount from
its previous price can constitute retail price competition
"whether or not" the retailer ultimately charges the lowest
retail prices in the market.

It is unnecessary to engage with Dr. Ratliff's theoretical
argument and the extent to which it does or does not provide a
framework for asserting that Diesel was injured by the specific
price-fixing conspiracy at issue here.  It is enough to note
that his theoretical argument is untethered to any evidentiary
record.  Diesel has failed to provide sufficient evidence from

which any juror could reasonably determine the extent to which Diesel was actually engaged at any point in time in a regime of discounting-as-marketing-tool, much less that it was harmed by the conspirators' agency agreements and their ban on bundling and discounts.

Second, Diesel relies on Redford's recent statements to show that Diesel relied on aggressive discounting. These opinions are expressed in Redford's 2014 and 2015 deposition testimony and Redford's 2015 affidavit submitted in opposition to this motion.[18] Assuming these opinions are admissible evidence,[19] they do not create a question of fact regarding

---

[18] Diesel also provides one 2010 email from Redford in which he expresses some caution about making public statements until Diesel entered into direct contracts with the Publisher Defendants. This document states nothing about Diesel's discounting practices or its view of agency pricing.

[19] It is assumed that Redford's testimony about the nature of the business he founded and ran would be admissible as expert opinion testimony under Fed. R. Evid. 702. In 2001, Rule 701 was amended to provide that testimony cannot be received as lay opinion testimony if it is "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." See Fed. R. Evid. 701(c). Rather, a "lay opinion must be the product of reasoning processes familiar to the average person in everyday life." United States v. Haynes, 729 F.3d 178, 195 (2d Cir. 2013) (citation omitted). This rule "prevent[s] a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702." Id. (citation omitted). In contrast, the statements by Redford in emails, blog posts, and correspondence offered by the Publisher Defendants are admissible as admissions by a party-opponent. See Fed. R. Evid. 801(d)(2).

Diesel's discounting that requires a trial.

First, Redford asserts that Diesel was focused on discounting backlist titles, particularly the romantic novels of Diesel's eBook Eros division, rather than the frontlist New York Times bestsellers targeted by its discounting competitors. Redford claims that Diesel used software to check Amazon's prices in order to sell the selected e-books for less than Amazon did.  Redford also asserts that Diesel's rewards program provided its customers on average with 3.5 cents for every $1 they spent.  He attests that the conspirators' ban on rewards' programs was "shatter[ing]" to Diesel.

The statements Redford has made in the course of this litigation could, theoretically, provide useful information to place Diesel's business records in context.  But, without any business records to show at least to some extent the nature and scope of the Diesel bundling, discounting, and rewards programs, they merely invite the jury to engage in guesswork.  The plaintiff bears the burden of proving causation, even when the defendants engaged in a naked price fixing conspiracy.  Diesel has not met that burden.

Diesel next argues that, despite his many recorded statements to the contrary, Redford was indeed worried about the impact of the agency system on Diesel.  Redford explains that he simply kept his concerns about agency pricing private so as not

to alienate agency publishers with whom he was seeking direct
supplier relationships.[20]  As already described, these recent
statements stand in sharp contrast to the contemporaneous
documentary record.  Many of Redford's contemporaneous
statements were made to investors to whom he would have owed
certain duties of honesty.  See Chris-Craft Indus., Inc. v.
Piper Aircraft Corp., 480 F.2d 341, 364 (2d Cir. 1973)
("Corporate officers and directors in their relations with
shareholders owe a high fiduciary duty of honesty and fair
dealing.").  Whatever Redford's opinions actually were regarding
the impact of agency pricing on Diesel's business, these
opinions cannot substitute for evidence of the extent to which
Diesel actually relied or wished to rely on discounting
practices banned by the Publisher Defendants' conspiracy.  In
short, Redford's opinions do not create a genuine dispute as to
the nature of Diesel's business model prior to agency, much less
a genuine dispute as to whether the elimination of retail price
competition actually inflicted harm on Diesel.  See, e.g., AEP
Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d
699, 735-36 (2d Cir. 2010) (evidence created after summary

---

[20] The Publisher Defendants have cast doubt on this explanation
by offering evidence that Redford was not shy in expressing his
frustration with them and did not hesitate to alienate them.
Redford's actual state of mind in 2010 and thereafter, however,
presents a question of fact for the jury.

judgment was filed could not raise an issue of fact where it was contradicted by documents created at the same time as the transaction at issue).  Such testimony, "unsupported by documentary or other concrete evidence . . . , is simply not enough to create a genuine issue of fact in light of the evidence to the contrary." Argus Inc., 801 F.2d at 45.

Finally, Diesel relies on the decline in its financial performance following the switch to the agency model as evidence that the conspiracy must have been the cause of Diesel's collapse.  The Publisher Defendants have pointed to evidence of weakness in Diesel's performance prior to the implementation of their conspiracy to undercut Diesel's contention.  The parties' dispute about the arc of Diesel's financial fortunes presents a factual question for a jury to resolve.  In the context of an emerging industry and rapidly changing market, however, when so many disparate factors are in play, Diesel cannot rely solely on its description of its financial performance to carry its burden of showing that the defendants' conspiracy was a substantial or materially contributing factor to its decline.  Indeed, Diesel's reliance on the timing of its revenue drop to prove that the conspiracy caused its injury is a post hoc ergo propter hoc logical fallacy.[21] Cf. Rothstein v. UBS AG, 708 F.3d 82, 96 (2d

---

[21] Post hoc ergo propter hoc, translated as "after therefore resulting from it," refers to "the logical fallacy of assuming

Cir. 2013); Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997).

## II. Other Alleged Antitrust Injuries

Unable to establish that it suffered an injury as a result of its inability to discount and bundle the Publisher Defendants' e-books, Diesel tries to present other alleged injuries arising from the agency conspiracy.  In particular, Diesel argues that it sustained an antitrust injury when its supply of inventory was disrupted at the time the agency distribution system went into effect, which it calls the "product outage."  To succeed on this claim, the plaintiff's asserted injury from the product outage must be "inextricably intertwined with the conduct's anti-competitive effects and thus flow[] from that which makes defendants' acts unlawful."  In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 688 (2d Cir. 2009) (citation omitted) (addressing antitrust standing).

Diesel has offered evidence that the product outage damaged its business and argues that the outage was a foreseeable consequence of the Publisher Defendants' rapid implementation of the agency model.  The temporary interruption in the supply chain that accompanied the agency transition, however, occurred

_____

that a causal relationship exists when acts or events are merely sequential."  Black's Law Dictionary (10th ed. 2014).

independently of the "anti-competitive effects" of that illegality.  Id.  The illegality alleged here is the conspiracy to eliminate retail price competition for certain e-books.  This lawsuit is not premised on a theory that the Publisher Defendants conspired to eliminate e-book wholesalers or harm independent retailers dependent on wholesalers.

Even if each of the Publisher Defendants responsible for supplying Diesel with e-books had independently decided to switch to an agency model, Diesel would have experienced disruption to its inventory because of its dependence on Ingram.[22]  The product outage was merely incidental to the implementation of agency pricing and thus did not "flow from that which makes the defendants' acts unlawful."  Gatt Commc'ns, Inc., 711 F.3d at 76 (citation omitted).

Similarly, Diesel cannot point to losses from the enforcement of territorial restrictions as a source of an antitrust injury.  The territorial restrictions are wholly independent of agency pricing, as Diesel acknowledges in its 2012 Memorandum.  Diesel agreed to the restrictions prior to agency pricing, and was on notice of enforcement activities

---

[22] DNAML, the plaintiff in a related antitrust case brought against the same defendants, did not rely on wholesalers and had a direct relationship with Hachette.  At the time Hachette adopted the agency model, DNAML experienced no product outage. DNAML Pty, Ltd. v. Apple, 13-cv-6516, 2015 WL 9077075 (S.D.N.Y. Dec. 16, 2015).

prior to the period of agency as well.  The plaintiff's argument that the agency model led to greater enforcement does nothing to change the fact that Diesel was already obligated to honor this provision of its contracts.

In sum, Diesel has not provided evidence to establish the allegation that allowed its case to proceed to discovery: that its business was predicated on competitive discounting that brought the price of its e-books around or below the prevailing price.  The record establishes that Diesel's business was not grounded in price competition with its major competitors and that, as a consequence, it viewed the adoption of the agency model as something that would assist it.  Thus, Diesel has not presented sufficient evidence to permit a jury to find that the failure of its business was an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  ARCO, 495 U.S. at 334.

**CONCLUSION**

The Publisher Defendants' September 18 motion for summary judgment is granted and the plaintiff's claims are dismissed with prejudice.  A scheduling order will address the counterclaims, each of which remains in this action.

SO ORDERED:

Dated:    New York, New York
          February 5, 2016

_____
                    DENISE COTE
          United States District Judge